192 P.3d 1065

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Sarah Kathleen PEARCE,
Defendant–Appellant.**

**No. 34491.**

Supreme Court of Idaho,
Boise, April 2008 Term.

Aug. 28, 2008.

Greg S. Silvey, Boise, for appellant.

Honorable Lawrence G. Wasden, Attorney General, Boise, for respondent. Kenneth Jorgensen argued.

J. JONES, Justice.

Sarah Kathleen Pearce appeals from her conviction of conspiracy to commit robbery, robbery, conspiracy to commit first degree kidnapping, first degree kidnapping, aggravated battery, and aiding and abetting attempted first degree murder. She contends that the district court (1) erred when it declined to allow her expert witness to testify on lineup procedures and the effect of such procedures on identifications, (2) erred by failing to instruct the jury regarding dangers inherent in eyewitness identification, and (3) violated her due process rights when it failed to admit the prosecutor's arguments from co-defendants' trials. The Court of Appeals concluded that the district court erred in failing to allow Pearce's expert to testify, but that any error was harmless. The Court of Appeals affirmed her conviction. Pearce petitioned this Court for review and we granted it.

## I.

### FACTUAL AND PROCEDURAL SUMMARY

In the early morning hours of June 15, 2000, as Linda LeBrane was driving eastbound on Interstate 84, she was forced off the road by a vehicle carrying three men and one woman. The woman, later identified as Pearce by LeBrane and other witnesses who saw the group either before or after the attack, entered LeBrane's vehicle and unlocked her driver's side door. The three men, since identified as John David Wurdemann (John), Kenneth Wurdemann (Kenneth), and Jeremy Sanchez, along with Pearce, forced LeBrane from her vehicle and demanded money and drugs. John, Sanchez, and Pearce punched, struck, stabbed, and cut LeBrane with their fists and sharp instruments while Kenneth struck LeBrane with an aluminum baseball bat. The assailants took money and property from LeBrane, including a credit card, and transported her to a location on Farmway Road in Canyon County. LeBrane was again forced from the vehicle, beaten, stabbed, cut, and struck repeatedly before John and Sanchez set fire to her vehicle. The group left her lying in the dirt at the scene.

On March 13, 2003, Pearce was charged by indictment, which alleged that she was the female assailant. At trial, Pearce steadfastly contended she was not the woman involved. Her defense rested, in part, on the allegedly questionable ability of LeBrane to identify the female perpetrator. Evidence at trial indicated that prior to the attack LeBrane had smoked two marijuana cigarettes and was "loaded" by the time her car reached the

Caldwell area. Additionally, LeBrane lost her glasses during the attack. Although the point at which she lost them is not clear, she admitted being nearsighted and unable to see without them. In the course of the investigation, LeBrane incorrectly identified two different women in two separate photo lineups. Pearce was in neither of the photo lineups. When questioned at trial, LeBrane admitted that the first woman she identified was the one most resembling the composite picture created after the incident[1] and that the second was the woman most resembling the actress who portrayed the female assailant in a television episode of *America's Most Wanted*, which featured the crime. LeBrane eventually identified Pearce in the third lineup—a video lineup that did not have any persons from the two previous photo lineups.

The methods employed in showing LeBrane the photo and video lineups were called into question at trial. Robert Miles, a detective with the Canyon County Sheriff's Office and the primary investigator on the case, testified that he had never received any training on how to conduct a photo lineup. In addition, when Miles instructed LeBrane regarding the photo lineup, he told her to identify the person who "most closely resembled" the perpetrator rather than telling her to pick the perpetrator if she was in the lineup. In one photo lineup, after LeBrane identified one person who she was positive was the female assailant, Miles told LeBrane she had picked the wrong person. With respect to the video lineup, Miles notified LeBrane prior to her identification that the lineup contained a person of interest.

In addition to LeBrane, several other people who allegedly saw the four perpetrators near the time and place of the attack identified Pearce as the female in the group, both in lineups and eventually in court. Keith Mower, who encountered the group at a rest stop on the night of the attack, identified Pearce as the female accompanying the Wurdemann brothers and Sanchez, both in a video lineup and later at trial. Steve Rupert,

a clerk at a motel where the perpetrators allegedly stopped after the attack, also identified Pearce in the video lineup and in court, as having been with the three men. Rupert's son, Joseph, also identified Pearce in the video lineup and at trial as having been at the motel.

LeBrane complained the photo lineups made identification difficult, but that the video lineup was more helpful. During one of the photo lineups, she told the deputy, "I need to see these people in person. I need to see height. I need to see body movements. I need to see body language. I need to hear voices." She repeated this concern during the investigation. Mr. Mower also testified that the video lineup was "much, much better" than the photo lineups, and that it was much easier to make an identification with the video lineup.

Pearce offered Dr. Charles Honts, a psychology professor at Boise State University, to testify as an expert regarding the reliability of eyewitness identification, including commentary on lineup procedures. The state moved to exclude the testimony of Dr. Honts prior to trial. The district court allowed Dr. Honts to testify as an expert witness, but limited his testimony to the characteristics of memory without relation to the identifications in Pearce's case. Additionally, the court did not allow Dr. Honts to testify regarding lineup procedures and resulting identifications in general, finding he was not sufficiently qualified as an expert in this area, either as to his background or his knowledge of the facts of Pearce's case.

Pearce also called Kenneth as a defense witness. Kenneth, who had confessed to his participation in the attack, had previously testified for the state at the trials of John and Sanchez, who were both convicted for their involvement. During Sanchez' first trial,[2] he testified that Pearce was not the woman involved, but at Sanchez' second trial he testified he did not know whether she was the woman. At Pearce's trial, Kenneth testi-

---

1. Carrie Parks, the forensic artist who prepared the composite of Pearce, testified at trial that the eyes described to her by LeBrane were too large for an adult due to LeBrane's intense anger toward her attacker and that LeBrane's emotions

were preventing her from giving an accurate description.

2. Sanchez' first trial ended in a mistrial.

fied on direct examination that he had never seen the female participant prior to the night of the attack and that he did not believe the woman was Pearce. The state then impeached Kenneth's credibility on cross-examination, focusing on his dishonesty throughout the investigation of the crime and his potential motive to lie.

Following the state's cross-examination of Kenneth, Pearce brought a motion to dismiss. She asserted a due process violation based on the state's inconsistent treatment of Kenneth's testimony for different defendants charged with the same crime. Pearce also moved to admit as admissions of a party opponent the closing arguments from Sanchez' first trial, where the state asserted that the jury should believe Kenneth's testimony, specifically that regarding Pearce, as well as the sentencing argument in Kenneth's case. The district court denied both the motion to dismiss and the motion to admit the arguments. The jury subsequently found Pearce guilty of all charges except aiding and abetting arson.

On appeal to the Court of Appeals, Pearce asserted the district court erred in refusing to allow Dr. Honts to testify as to lineup procedures and resulting identifications, failing to instruct the jury about the weaknesses of eyewitness identifications, denying her motion to dismiss, and excluding arguments from prior proceedings. Finding the record insufficient to determine whether the exclusion of certain expert testimony by Dr. Honts was erroneous or whether any such error would have been prejudicial, the Court of Appeals issued an order for temporary remand, directing the district court to receive an offer of proof by Pearce as to the specific testimony that would have been proffered at trial by Dr. Honts if it had not been excluded by the trial court on the state's motion *in limine*. The district court held an evidentiary hearing on the matter and such record was before the Court of Appeals for its consideration and for ours on review.

## II.

## ISSUES ON APPEAL

The following issues are presented for determination: (1) whether the district court erred by declining to allow Pearce's expert witness to testify about lineup procedures and the effect of such procedures on identifications; (2) whether the district court erred by failing *sua sponte* to instruct the jury as to the dangers inherent in eyewitness identifications; and (3) whether the district court erred in denying the motion to dismiss and the related motion to admit prior prosecution arguments.

## A.

**The district court did not abuse its discretion in excluding certain testimony of Dr. Honts.**

Pearce argues the district court abused its discretion in finding that Dr. Honts lacked the necessary education, experience, and factual background, to testify about police lineup procedures and the effect of procedures on identifications. A trial court's decision regarding the admission of expert testimony is reviewed for abuse of discretion. *State v. Merwin*, 131 Idaho 642, 645, 962 P.2d 1026, 1029 (1998). When determining whether the district court abused its discretion, we consider: (1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason. *McDaniel v. Inland Northwest Renal Care Group–Idaho, LLC*, 144 Idaho 219, 221–22, 159 P.3d 856, 858–59 (2007).

To give expert testimony, a witness must first be qualified as an expert on the matter at hand. *State v. Trevino*, 132 Idaho 888, 895, 980 P.2d 552, 559 (1999). Idaho Rule of Evidence 702 is the appropriate test for measuring the reliability of evidence for expert testimony. *Merwin*, 131 Idaho at 646, 962 P.2d at 1030. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience or specialized knowledge may testify thereto in the form of opinion or otherwise." Idaho

R. Evid. 702. Otherwise stated, the rule provides that qualified experts may testify in the form of an opinion only if their specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue. There must be some demonstration that the witness has acquired, through some type of training, education or experience, the necessary expertise and knowledge to render the proffered opinion. *State v. Eytchison,* 136 Idaho 210, 213, 30 P.3d 988, 991 (Ct.App. 2001). A witness may be qualified to render opinions about some things but not others. *West v. Sonke,* 132 Idaho 133, 139, 968 P.2d 228, 234 (1998). Once the witness is qualified as an expert, the trial court must determine whether such expert opinion testimony will assist the trier of fact in understanding the evidence. *State v. Hopkins,* 113 Idaho 679, 680–81, 747 P.2d 88, 89–90 (Ct.App.1987) (citing *Sidwell v. William Prym, Inc.,* 112 Idaho 76, 80–81, 730 P.2d 996, 1000–01 (1986)). If the court concludes, as it did here, that the witness is not qualified to testify as to a particular matter, it is irrelevant whether such testimony would assist the trier of fact.

In this case, the district court first addressed whether the witness could testify about the reliability of eyewitness testimony, citing Idaho Rules of Evidence 401, 403, 702 and 704, and relying on numerous prior cases, including *State v. Hoisington,* 104 Idaho 153, 657 P.2d 17 (1983), *State v. Alger,* 115 Idaho 42, 764 P.2d 119 (Ct.App.1988), and *State v. Hester,* 114 Idaho 688, 760 P.2d 27 (1988). Using these rules and cases, the district court properly identified the legal standards applicable to this issue, and considered whether the proffered testimony would "assist the trier of fact." The court concluded that Dr. Honts' testimony concerning the various characteristics of memory and techniques related to memory was beyond the common experience of the jury and therefore admissible. The court also found that "Dr. Honts possessed the necessary qualifications, education, and experience to provide assistance and insight to the jury concerning these characteristics of memory."

The district court, however, concluded that Dr. Honts could not testify about photo lineups, video lineups, and resulting identifica-

tions because it "was not persuaded," based on the offer of proof, that Dr. Honts was qualified to testify on these particular issues. The district court applied the same legal standards on this issue as it did to the issue of whether Dr. Honts was qualified to testify regarding the characteristics of memory, and the reliability of eyewitness identifications generally. The court examined Dr. Honts' qualifications and performed a thoughtful analysis of his ability to testify regarding the lineup issues:

> The court further concludes, however, that Dr. Honts will not be permitted to testify concerning photo line-ups and video line-ups and resulting identification. First, the court is not persuaded, based on the offer of proof, that Dr. Honts possesses the necessary qualifications to testify concerning these issues. He testified that he has never participated in a police line-up, that he has never conducted a line-up, and that he has never interviewed or spoken with any of the witnesses in this case whose testimony was relevant to those issues: Linda LeBrane, Keith Mower, Janine Waggoner, Steven Rupert, Officer Bob Miles, Officer Chris Smith, Officer Gary John, Dan Hally, or Carrie Parks. Further, he acknowledged having viewed only two of the many composite drawings involved in this case. Although he has viewed three video line-ups, he only did so for the first time two days ago. The court is not persuaded that Dr. Honts has the requisite factual information, background, and preparation concerning the eyewitness identification issues in this case to provide expert testimony on those matters. He has conducted no research in the area of photo line-ups or video lineups, and has never been qualified before to testify as a witness on these issues. Although he has testified previously in sixty-three (63) proceedings, the vast majority of his training, expertise, and court testimony has been concentrated in the area of polygraphs, an issue which is not presented in this case. The court is mindful that Dr. Honts teaches an upper division psychology class at Boise State University entitled "Psychology and the Law," a course which covers a wide variety of topics of psychology related

to the legal profession and forensics; however, the court is not persuaded that he possesses sufficient expertise or experience in the area of photo line-up identification, video line-up identification, and recommended procedures for conducting lineups and photo spreads so as to meet the threshold necessary to qualify him as an expert for the purpose of analyzing the particular lineups in this case, the witness identifications arising therefrom, and offering his opinion as an expert to the jury. Additionally, any opinion Dr. Honts might offer concerning the particular witness identifications in this case, including, e.g., suggestability or tainted memories, begins to tread into impermissible ground: the credibility of the witness identification, which is the absolute province of the jury as the finders of fact.

█ The record amply supports the court's reasoning here. The judge acted within her discretion in determining that Dr. Honts did not possess the necessary skill, experience, or specialized knowledge specific to lineup procedures. To the contrary, Dr. Honts' area of expertise is actually in the field of polygraph testing, which was not at issue in this case. Dr. Honts had dealt only peripherally with lineup procedures and issues, having "talk[ed] about eyewitnesses, how to do lineups, how to conduct interviews," in his Psychology and the Law class, and having heard about the issue at conferences put together by the American Psychology–Law Society. Dr. Honts expressly admitted that he had not "specifically done" research in the area of eyewitness identification. Although he located a Department of Justice article entitled "Eyewitness Evidence Guide, A Guide for Law Enforcement," he admitted he had not read the entire article. As counsel for the state noted at trial, Dr. Honts merely "acted as librarian" for the defense. The record reveals sufficient evidence to support the district court's conclusion that Dr. Honts lacked academic or practical experience specific to the area of lineup procedures.

Although there are grounds for concern regarding various aspects of the lineup procedures, particularly the photo lineups, and though it would likely have been helpful to have testimony from an expert on the matters the district court found Dr. Honts did not have the proper credentials upon which to opine, we cannot find that the court abused its discretion in excluding his testimony on these matters. An examination of the court's decision clearly demonstrates the court viewed the issue as one of discretion, acted within the boundaries of its discretion, and reached its decision by an exercise of reason. The record adequately supports the court's reasoning, which logically flows from the legal standards it expressly relied upon in its decision.

**B.**

**The district court did not err by failing *sua sponte* to instruct the jury as to the dangers inherent in eyewitness identification.**

█ Pearce asserts the district court erred in failing to instruct the jury on the dangers inherent in eyewitness identification, arguing the jury should have been instructed on factors to consider in determining the accuracy of eyewitness identifications.[3] Whether a jury has been properly instructed is a question of law. *State v. Gleason,* 123 Idaho 62, 65, 844 P.2d 691, 694 (1992). This Court exercises free review over questions of law. *Id.*

█ In charging the jury, the court must state to them all matters of law necessary for their information. I.C. § 19–2132(a). Either party may present to the court any written charge and request that it be given. *Id.* "A defendant is entitled to an instruction where 'there is a reasonable view of the evidence presented in the case that would support' the theory." *State v. East-*

---

3. Pearce was tried prior to the amendment to Idaho Criminal Rule 30(b). Idaho Criminal Rule 30(b) now says "[n]o party may assign as error the giving of or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the instruction to which the party objects and the grounds of the objection." Prior to the amendment, a failure to object at trial did not constitute a waiver of an objection on appeal. *State v. Cuevas–Hernandez,* 140 Idaho 373, 375, 93 P.3d 704, 706 (Ct.App.2004).

*man,* 122 Idaho 87, 90, 831 P.2d 555, 558 (1992). However, there is no duty for a trial court *sua sponte* to instruct the jury on every theory the defendant may have. "It is incumbent upon the defendant to submit a requested instruction or in some other manner apprise the trial court of the specific instructions requested." *Id.*

 Pearce failed to offer an instruction on the dangers inherent in eyewitness identification. This Court will not allow a defendant to appeal an instruction which was never offered at the trial level, unless that instruction constitutes a necessary matter of law whose omission would constitute fundamental error. *State v. Anderson,* 144 Idaho 743, 748–49, 170 P.3d 886, 891–92 (2007) (holding that even though new Idaho Crim. R. 30 expressly requires objection to preserve jury instruction issue on appeal, defendant may still appeal jury instructions, even without objection, where fundamental error occurs in instructions).

 It is the defendant's obligation to present his theories to the trial court, and the trial court is not under a duty to determine on which theories to instruct the jury. *Eastman,* 122 Idaho at 91, 831 P.2d at 559. A defendant may not claim error on appeal for a defense theory which does not constitute a necessary matter of law and for which no instruction was requested. The trial court did not err in failing *sua sponte* to instruct the jury on the inherent dangers of eyewitness identification.

### C.

**The district court did not err in denying the motion to dismiss.**

At trial, Pearce called Kenneth to testify in her defense. Kenneth had previously pleaded guilty for his role in the attack and had testified as a state witness in the two trials of Jeremy Sanchez. At Sanchez' first trial, Kenneth testified John and Sanchez were the other male assailants. Kenneth testified he did not know the female assailant, but that it was not Pearce. During Sanchez' second trial, Kenneth testified consistently as to the male assailants but then stated that he did not know whether Pearce was the female

involved. Finally, at Pearce's trial, Kenneth again testified that he did not believe Pearce was the female assailant. The state attempted to impeach Kenneth's credibility by using instances of his dishonesty throughout the investigation of the crime. However, the state had defended Kenneth's credibility during the Sanchez trials, despite defense counsel's similar attack on his veracity using essentially the same instances of dishonesty. Pearce moved to dismiss at the close of Kenneth's testimony, claiming the state's opposing positions about Kenneth's credibility violated her constitutional right to due process.

 When an appellant asserts the violation of a constitutional right, we give deference to the trial court's factual findings unless those findings are clearly erroneous. *State v. Henage,* 143 Idaho 655, 658, 152 P.3d 16, 19 (2007). We exercise free review over the trial court's determination as to whether constitutional requirements have been satisfied in light of the facts found. *Id.* The Due Process Clause guarantees every defendant the right to a trial comporting with basic tenets of fundamental fairness. *Lassiter v. Dept. of Soc. Servs.,* 452 U.S. 18, 24–25, 101 S.Ct. 2153, 2158–2159, 68 L.Ed.2d 640, 647–648 (1981); *Turner v. Louisiana,* 379 U.S. 466, 471–72, 85 S.Ct. 546, 548–50, 13 L.Ed.2d 424, 428–29 (1965).

Pearce argues the state's conduct in her trial is akin to that in *Thompson v. Calderon,* 120 F.3d 1045, 1058–59 (9th Cir.1997) (en banc), *vacated on other grounds,* 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998), where a plurality of the Ninth Circuit found the State of California violated a defendant's right to due process by arguing at his trial that he alone committed a murder, while arguing at a subsequent trial that another defendant committed the same murder. The court held that the prosecutor, by discrediting the evidence he had used in a previous trial that a different defendant was the solitary offender, violated his prosecutorial duty to "vindicate the truth and to administer justice." *Id.* at 1058. Ultimately, the court held that "it is well established that when no new significant evidence comes to light, a prosecutor cannot, in order to con-

vict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime." *Id.; see also Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir.2000) (use of witness's first statement in trial of one defendant and then use of witness's second, contradictory statement against different defendant in subsequent trial, in order to convict both defendants of same crime, violated due process).

■■■ This case differs substantially from these federal cases. Those courts were guarding against multiple defendants being convicted for committing the same crime, which the evidence showed could only have been committed by one perpetrator. Here, the state changed its *position* about the credibility of a witness. In the federal cases, the government changed its *theory and evidence* about the perpetrator of the crime. This is a crucial distinction. The *Calderon* court itself recognized the difference, citing to an opinion by then-Judge Kennedy wherein he concluded that "reversal is not required when the underlying theory 'remains consistent.'" 120 F.3d at 1058–59 (quoting *Haynes v. Cupp*, 827 F.2d 435, 439 (9th Cir.1987)). Post-*Calderon*, the Ninth Circuit and other courts have explicitly recognized that not every prosecutorial variance amounts to a due process violation. *See, e.g., State v. Sanchez*, 142 Idaho 309, 322, 127 P.3d 212, 225 (Ct.App.2005) (citing *Groose*, 205 F.3d at 1052) ("to violate due process, an inconsistency must exist at the core of the prosecutor's cases against defendants accused of the same crime"). The Ninth Circuit distinguished *Calderon* in *Nguyen v. Lindsey*, 232 F.3d 1236, 1240 (9th Cir.2000), where the defendant claimed a due process violation based on the prosecutor's differing arguments at co-defendants' trials as to which of them shot first. The court relied on the fact that the prosecutor "presented the *same underlying theory* of the case at each trial—when a shot kills a third person in a voluntary gun battle, the initiator and those who voluntarily took part in the mutual combat are responsible for the crime." *Id.* (emphasis added). Regarding who took the first shot, the court recognized the prosecutor made different arguments at each trial but that "these arguments were consistent with the evidence ac-

tually adduced at each trial." *Id.* Unlike in *Calderon*, both defendants could be guilty of the same ·crime due to the nature of the crime. *Id.; see also State v. Moody*, 208 Ariz. 424, 94 P.3d 1119, 1134 (2004) ("[The defendant] is only one person, and the theories offered are not necessarily inconsistent. Thus [*Calderon* ] is inapposite.").

In this case, the prosecution was not advancing a different theory or inconsistent evidence in challenging Kenneth's credibility at Pearce's trial. To the contrary, the state maintained throughout each trial that Sanchez, Kenneth, John, and Sarah Pearce were all culpable in the attack.

■■■ While a prosecutor, as the agent of the people and the state; has the unique duty to ensure a fundamentally fair trial by seeking not only to convict, but also to vindicate the truth and to ·administer justice, courts have largely recognized the limits of punishing prosecutors for apparent inconsistencies in their approach to criminal trials absent a "core" inconsistency. *See Sanchez*, 142 Idaho at 322, 127 P.3d at 225 (citing *Groose*, 205 F.3d at 1052). We also note there is no evidence the prosecution in this case engaged in premeditated manipulation of evidence. In the previous trials, the State had relied on Kenneth's testimony that John and Sanchez were the other male assailants—testimony from which Kenneth did not waver throughout the trials. In contrast, during Pearce's trial, the State was faced with Kenneth's fluctuating testimony regarding the identity of the female assailant. Forcing the prosecution to simply accept his assertions and abstain from impeachment, simply because it had bolstered his credibility when it previously used a different portion of his testimony, would essentially strip the State of an important tool in its trial arsenal. We conclude Pearce did not suffer a violation of her due process rights, and the district court did not err in denying Pearce's motion to dismiss.

## D.

**The district court did not ·err in denying the motion to admit prior prosecution arguments.** ·

■■■ We next consider whether the district court erred in declining to allow

Pearce to present the prosecution's arguments from Sanchez' first trial and Kenneth's sentencing hearing to the jury as evidence of the inconsistency.[4] Pearce contended these statements should have been allowed in as admissions of a party opponent. The trial court has broad discretion in the admission of evidence at trial and its judgment will be reversed only where there is an abuse of that discretion. *State v. Howard,* 135 Idaho 727, 731–32, 24 P.3d 44, 48–49 (2001); *State v. Zimmerman,* 121 Idaho 971, 973–74, 829 P.2d 861, 863–64 (1992).

The question of whether a party may admit a prosecutor's prior statements in related cases as admissions of a party opponent is one of first impression in Idaho. Courts elsewhere have varied in their treatment of the issue.[5] Historically, such statements were rarely admissible. While some courts persist in refusing to admit such statements as party admissions under Federal Rule of Evidence 801(d)(2), *see, e.g., United States v. Zizzo,* 120 F.3d 1338, 1351 n. 4 (7th Cir.1997), several federal courts have recently endorsed the use of counsel's inconsistent statements by concluding they are not *per se* inadmissible. For example, in *United States v. McKeon,* 738 F.2d 26 (2d Cir.1984), the Second Circuit held that statements of the de-fendant's attorney in a criminal case are admissible in a subsequent trial as an admission of a party opponent where they are: (1) assertions of fact equivalent to a testimonial statement by the client; (2) inconsistent with similar assertions in a subsequent trial; and (3) not subject to an innocent explanation for the inconsistency.[6] *Id.* at 33. In *United States v. Salerno,* 937 F.2d 797, 811–12 (2d Cir.1991), *rev'd on other grounds,* 505 U.S. 317, 322, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992), the Second Circuit specifically applied the *McKeon* factors to prosecutorial statements. There, the court allowed the admission of certain statements where the prosecutor, in a previous trial, had characterized the defendant contractor as the victim of extortion by a RICO enterprise, but in a subsequent bid-rigging trial had attempted to paint him as culpable in the scam. *Salerno,* 937 F.2d at 811–12; *see also United States v. DeLoach,* 34 F.3d 1001, 1005–06 (11th Cir. 1994) (citing to *McKeon* and *Salerno,* the court upheld exclusion of prosecutor's statements from earlier trial of co-defendant where prosecutor argued against defendant's culpability in the first trial and for it in the second after finding the prosecutor's statements were not statements of fact and were

---

4. The state contends this issue is not properly on appeal because Pearce did not challenge the district court's actual ruling. It asserts the district court denied the motion on the grounds that Pearce had failed to present any evidence of an "admission" of a party opponent and, since Pearce does not specifically challenge this reasoning on appeal, she has failed to show error in the court's ruling. We disagree. The state's brief implies the district court's reasoning for denying the motion was unequivocally a lack of proffer. However, we read the transcript differently and are convinced the ruling is more ambiguous. While the court does mention it did not receive a specific presentation of Pearce's proposed evidence, it is not clear this was the reason for denying the motion; in fact, the court prefaced its ruling by saying "based on what has been presented ..." implying it was willing to (and did) deny the motion and reserve ruling without a formal proffer. Furthermore, while the court expressed some dismay at the lack of evidence before it, we note it would have been unreasonable to automatically deny the motion on this ground given that Pearce had been afforded virtually no time to gather the evidence— the cross examination having occurred on Friday afternoon and the motion having been filed Mon-day morning—and counsel's assertion that he was in the process of obtaining the necessary transcripts. We think it unlikely the court would have acted so cursorily and assume it was, despite unclear articulation, actually a ruling on the merits. Therefore, we address the substance of Pearce's claim.

5. *See* Anne Bowen Poulin, *Party Admissions in Criminal Cases: Should the Government Have to Eat its Words?,* 87 Minn L.Rev. 401, 406–08, 412–18 (2002).

6. Furthermore, the court listed five factors to be considered when evaluating admissibility: (1) the prospect that free use of attorney statements from prior trials will "consume substantial time to pursue marginal matters;" (2) the risk of inviting unfair inferences from inconsistent positions; (3) the possibility of deterring "vigorous and legitimate advocacy;" (4) the risk that forcing explanation of inconsistency may "expose work product, trial tactics, or legal theories" thus compromising the client's rights; and (5) the risk that admission will require the removal of the attorney who made the prior statements. *McKeon,* 738 F.2d at 32–33.

not inconsistent with government's position in its prosecution of the defendant).[7]

While Pearce relies on the reasoning of these cases, specifically Salerno, to support her contention for admission, a closer examination shows they actually refute it. Both *McKeon* and *Salerno* recognized that "serious collateral consequences could result from the unbridled use of such statements." *Salerno*, 937 F.2d at 811. In fact, the *McKeon* court carved out an explicit limitation to admissibility saying that "[s]peculations of counsel, *advocacy as to the credibility of witnesses*, arguments as to weaknesses in the [opponent's] case or invitations to a jury to draw certain inferences" were excluded from its pronouncement admitting certain prosecuting attorney statements. *McKeon*, 738 F.2d at 33 (emphasis added). The court implied these were not statements of fact equivalent to testimonial statements by the client, but constituted advocacy regarding witness credibility and inferences to be drawn from the evidence. *Id.; accord Salerno*, 937 F.2d at 811 (requiring prosecutor's inconsistent statement to be one of fact if admission is to be appropriate). This limitation recognizes and respects the prosecutorial role in the trial process. As a California appellate court has articulated, "[t]he prosecutor, after all, [is] neither a participant nor a witness, and has no knowledge of the facts other than those gleaned from the witnesses and other available evidence." *People v. Watts*, 76 Cal.App.4th 1250, 1263, 91 Cal. Rptr.2d 1 (Cal.Ct.App.1999).

Here, the evidence Pearce sought to admit concerns statements made while the prosecutor was engaged in "advocacy as to the credibility of witnesses," a circumstance under which *McKeon* specifically stated an attorney's comments should not be admissible in a subsequent, related proceeding. *McKeon*, 738 F.2d at 33; *see also DeLoach*, 34 F.3d at 1005–06 (upholding lower court's exclusion of statements made by attorney during closing arguments); *People v. Cruz*,

162 Ill.2d 314, 205 Ill.Dec. 345, 643 N.E.2d 636, 664–65 (1994) (affirming exclusion of evidence of prosecution's strategy in earlier, related trial due to competing policy concerns); *People v. Morrison*, 178 Ill.App.3d 76, 127 Ill.Dec. 248, 532 N.E.2d 1077, 1088 (1988) (refusing admission of prosecutor's closing argument given in co-defendant's prior trial). Consequently, we conclude the district court did not err when it barred admission of the prosecutor's previous arguments.

## III.

We find that the district court committed no error in the proceedings and therefore affirm Pearce's judgment of conviction.

Justices BURDICK and HORTON concur.

Chief Justice EISMANN, specially concurring.

I concur in the majority opinion. My concurrence in Part II.A. is not an affirmation that every factor mentioned by the district court in its analysis was relevant. However, I agree that Pearce has not shown that the district court abused its discretion in ruling that Dr. Honts was not qualified to express an expert opinion on lineup procedures, based upon what was presented to the court at the time. In my opinion, the need for such testimony in this case does not enter into the analysis of whether the district court abused its discretion in making its ruling. If additional material should have been presented regarding Dr. Honts's qualifications or another expert selected, Pearce may have a claim for post-conviction relief.

Justice W. JONES, dissenting.

To the extent that the majority finds that the district court did not abuse its discretion in excluding Dr. Honts' testimony about photo lineups, video lineups and resulting identifications, I respectfully dissent. The district court's error in failing to find Dr. Honts

---

**7.** Some courts have adopted a more permissive approach to the admission of prosecutorial statements by conducting a simple Federal Rules of Evidence 801(d)(2) analysis without also applying the *McKeon* factors. *See United States v. Kattar*, 840 F.2d 118, 130–31 (1st Cir.1988); *United States v. Bakshinian*, 65 F.Supp.2d 1104, 1106–09 (C.D.Cal.1999). We reject this approach as it fails to afford even minimal deference to prosecutorial statements which have traditionally been inadmissible.

sufficiently qualified to testify on these matters constitutes reversible error. I have included in this dissent several crucial facts that the majority has omitted from their opinion.

## I.

### FACTUAL AND PROCEDURAL SUMMARY

The first composite sketches were created immediately following the June 2000 attack while Ms. LeBrane was still in the hospital and the first photo-spread was conducted in December of 2000. The photo-spread was prompted when the Las Vegas police contacted Canyon County with a person matching the description of the composite drawings for the female in the LeBrane attack. The second was conducted in January of 2002, when Jeremy Sanchez' girlfriend at the time of the attack was considered a person of interest. Ms. LeBrane identified one person from each of the two photo-spreads, neither being Pearce. Repeatedly throughout the process, Ms. LeBrane requested a video lineup because she was concerned about body language and height specifically. On numerous occasions, during the photo-spreads and during her testimony at trial, she expressed concern about identifying a person without seeing their height (in comparison to her height) and without seeing their body language.[8] Ms. LeBrane testified that she was adamant about seeing a video lineup after she made the second incorrect identification. Police officers did in fact make a video lineup at that time. However, no persons from the previous photo-spreads were in the video, and it is disputed whether Ms. LeBrane was told that a person of interest was in custody. Ms. LeBrane identified Pearce in her third identification, which was a video lineup, in April of 2002.[9]

A viewing of the video lineup shows that it consisted of six females. All six of the females are clothed in orange jumpsuits. Three of the six had their hair in a ponytail.

Two of the six (including Pearce) had short hair. One of the women (number 6) had hair that was styled (hairspray and/or gel) and was the only one wearing visible make-up. Detective Miles testified that all of the women in the lineup were from the general female inmate population at the Canyon County Jail. The six all stood in a line against a white wall; height was not indicated on the wall. The only reference to height is a comparison amongst other persons in the video lineup. Next, each was individually instructed to say "give me the [expletive deleted] *drugs;* give me the [expletive deleted] *money.*" [Emphasis added]. After speaking the instructed phrase, the person was instructed to face each direction, allowing for two profile views and a back view. When Pearce's individual turn came, the instructed phrase was switched to "give me the [expletive deleted] *money;* give me the [expletive deleted] *drugs* " and remained switched throughout the remainder of the lineup. [Emphasis added]. Pearce was the fourth person in the video lineup.

According to the presentence report, Sarah Kathleen Pearce (D.O.B. 11/01/1982) was seventeen years of age on the date of the attack. Pearce, at the time of the presentence report, was 5′6, weighing 130 pounds. She has red hair, brown eyes, and fair complexion. At the time of arrest, Pearce was 5′6, weighing 112 pounds. She is listed as a white female with red hair and brown eyes.

Ms. LeBrane has described the woman attacker as very pretty and attractive with freckles and light Hispanic skin tones. The woman's height has varied from shorter than 5′1 to around 5′4 and her age varied from mid to late twenties. Other witnesses have described the woman as young with reddish-blond hair, blond hair with ash color, and brown hair. Her height has been described as 5′0–5′6 and she weighs around 110–120 pounds. Her age varies from teens to thirties. Some witnesses describe her as Hispanic specifically. All witnesses agree that

---

**8.** "I judge the height by how tall people were standing by me." Ms. LeBrane is 5′1 or shorter.

**9.** Two video lineups of female suspects were created. However, only one was ever shown to the

witnesses because the detectives had begun to focus the investigation on Pearce (rather than an earlier suspect).

she has brown eyes. In addition to Ms. LeBrane's account and eyewitness identification, the State offered the following eyewitness testimony in the case:

*Keith Mower:* Mr. Mower witnessed four individuals at a rest stop around 1:15 a.m. on June, 15, 2000. He described the group as strange, consisting of one woman and three men. The woman was unique because she appeared to be too young to be with the men. She was young, looked and dressed nice, wore tight jeans and a simple white shirt. The woman had reddish-blond hair, was around 5′5 and weighed between 110–120 pounds. He only saw her face when she turned and looked back before entering the restroom at the rest stop. Mr. Mower testified that he paid the most attention to the woman out of the four at the rest stop because she did not look like she belonged with the group and she walked really slowly to the bathroom. But on cross-examination he admits that he did not get as good of a look at the woman as the men because he was in the bathroom at the same time as the men. Mr. Mower testified that he did not have problems verbalizing the images in his head to the composite artist because the images were still fresh in his mind.

He admits that he could not view the woman's face very well, but during the video line up realized that he could recognize her. Mr. Mower also identified a woman in a photospread conducted on November 28, 2000 (not Pearce). He was told to pick the person that looks most like the woman at the rest stop. He chose a woman from the photos that looked most like the woman from the rest stop, but he "didn't think that that was her. [It] . . . was the one that looked the closest to her." Mr. Mower identified Pearce at trial as the woman from the rest stop that night. He also identified a younger picture of her as the woman from the rest stop that night. Mr. Mower did note that Pearce was wearing her hair darker and styled differently than the woman at the rest stop. Several times before trial, Mr. Mower admitted to having seen pictures of Pearce on television.

*Jeanene Waggoner:* Ms. Waggoner testified that she was driving home around midnight on the night of the attack. While she was driving she saw a man standing in the middle of the road waving his arms. Ms. Waggoner spoke with the man and noticed that two other men and a woman were in the car. The woman had narrow shoulders, and was sitting in the front seat. The woman had blond hair with an ash color to it and it might have been a little golden; it was styled messy and spiked up. Ms. Waggoner did not identify Pearce as that woman. She was able to identify John and Kenneth Wurdemann, and Jeremy Sanchez from the video lineup.

*Steve Rupert:* Steve Rupert testified that he was working at a motel off the Caldwell exit on the night of the attack. A woman and man came in to rent a room around 3:30 am. They paid cash for the room in the amount of $38.55. Steve Rupert made a copy of the woman's Washington State driver's license. He described the woman as being in her late teens to early twenties. She was about 5′5 or 5′6 with brown hair. There were two more people waiting in the car. After leaving for the room, the woman and man returned, stating that the room was dirty, and asked for the return of the money and the copy of the driver's license. Steve Rupert complied. Steve Rupert believes he has seen the woman before the morning of June 15 and that Pearce is the woman that he saw on June 15, 2000. On cross-examination he stated he had not seen the woman before June 15, but had seen her later, in October or November of the same year. He created a composite sketch of the woman with a composite sketch artist. Steve Rupert also chose Pearce out of the video lineup.

Previously Steve Rupert had stated to the police and sketch artists that the woman was light-colored Hispanic, about five-feet tall and 110 pounds. Her age varied from mid-twenties to twenty-five to thirty. He has also described her hair as brown to red with dark brown eyes.

*Joseph Rupert:* Joseph works with his dad, Steve Rupert, at the motel in Caldwell. He was nineteen-years-old at the time of trial and was sixteen-years-old at the time of the attack. He saw the woman checking into the motel and described the woman as his age or a little older. He recognized the woman

from a mutual friend (Susan Davis),[10] but did not initially make a police report. Joseph chose Pearce on the video lineup.

He also testified that he and his dad moved to Caldwell in May and that he had seen Pearce before June 15, but doesn't know when or where. Susan Davis, the alleged friend of Pearce, was hired by the motel in July or August. Joseph definitely believes that he saw Pearce with Susan Davis at some point.

The majority opinion fails to take sufficient note of evidence that Ms. LeBrane's stolen credit card was used in Jordan Valley 30 minutes after Pearce was allegedly checking into the motel in Caldwell, which is inconsistent with the jury making a finding of guilt. Steve Rupert testified that the woman and man entered the motel around 3:30 a.m. on June 15, and a credit card statement shows that Ms. LeBrane's credit card was used at 4:01 a.m. in Jordan Valley. Jordan Valley, Oregon is in the same time zone as Caldwell and is 60 miles away by Highway 95.[11] A gas station attendant testified that the credit card was used by a Hispanic man in a maroon car with one or two Hispanic men and a Hispanic woman passenger.

The Court of Appeals unanimously held that the exclusion of Dr. Honts' testimony about police lineup techniques and resulting identifications was an abuse of discretion and therefore erroneous, but the court held any error was harmless. I agree with the Court of Appeals, that it was error to exclude the testimony, but firmly believe such error constitutes reversible error because of the importance of eyewitness identifications in this particular case.

## II.

## ANALYSIS

I disagree with the majority's holding that the district court did not err when it failed to qualify Dr. Honts as an expert witness on lineup procedures. The crux of the prosecution's case against Pearce consists of eyewitness testimony that identified Pearce as the woman who committed the attack. Pearce's entire defense rested on the contention that she was not the woman who committed the attack and that the identifications were made in error. Pearce offered testimony in an attempt to rebut the state's evidence against her, but the trial court refused that testimony. Specifically, the trial court refused to qualify Dr. Honts as an expert to testify on standardized procedures developed to ensure maximum accuracy in conducting lineups. Although the trial court is generally the gatekeeper of admissibility of evidence, this Court should not sit idly by and allow a clear and blatant abuse of that authority. Without this testimony, Pearce was denied the opportunity to present evidence to refute the nucleus of the state's evidence against her. I find that this denied Pearce the opportunity to a fair trial. I, therefore, respectfully dissent from the Majority's opinion and find that the trial court abused its discretion. The trial court's analysis suggests that an expert must be the best or most experienced in a field, which is clearly not required by the Idaho Rules of Evidence. Any shortcomings in Dr. Honts' training, experience, knowledge or expertise go towards the weight of his testimony, rather than the admissibility. The district court committed reversible error when it failed to find that Dr. Honts surpassed the minimum hurdle required for expert qualification.

## A.

**The district court abused its discretion by refusing to qualify Dr. Honts as an expert witness to testify as to lineup procedures and any resulting effects on eyewitness identifications.**

This Court will not overturn an erroneous lower court decision unless it affects a substantial right of the defendant. *See* I.C.R.

---

**10.** It is unclear from Joseph's testimony whether he recognized Pearce on the night of the attack as a person he knew, or whether he recognized the woman from the night of the attack and later made the connection to Pearce as that same woman.

**11.** Highway 95 is mostly a two lane road through mountainous terrain.

52. An error is harmless if the reviewing court determines beyond a reasonable doubt that the jury would have reached the same result. *State v. Gomez,* 137 Idaho 671, 673, 52 P.3d 315, 317 (2002). If the error concerns omitted evidence, "the test for harmless error is whether there is a reasonable possibility that the lack of excluded evidence contributed to the verdict." *Gomez,* 137 Idaho at 673, 52 P.3d at 317 (citations and internal quotations omitted). It is within the province of the jury to weigh conflicting evidence and determine the credibility of witnesses. *State v. Crea,* 119 Idaho 352, 353–54, 806 P.2d 445, 446–47 (1991) (citations omitted). A jury verdict will not be overturned on appeal unless clearly erroneous. *Crea,* 119 Idaho at 353–54, 806 P.2d at 446–47 (citations omitted). The state bears the burden of proving that a crime has been committed, and that the party charged committed the crime. *State v. Avelar,* 124 Idaho 317, 320, 859 P.2d 353, 356 (Ct.App.1993) (citations omitted). "The identification of the accused is an issue of fact for the jury, and may be proved by direct or circumstantial evidence." *Avelar,* 124 Idaho at 320, 859 P.2d at 356.

"[A]cademic training is not always a prerequisite to be qualified as an expert; practical experience or specialized knowledge may be sufficient." *State v. Eytchison,* 136 Idaho 210, 213, 30 P.3d 988, 991 (Ct.App. 2001) (citing *State v. Konechny,* 134 Idaho 410, 414, 3 P.3d 535, 539 (Ct.App.2000)). Any weight given to the expert testimony is left to the jury. *State v. Hopkins,* 113 Idaho 679, 681, 747 P.2d 88, 90 (Ct.App.1987) (citing *IHC Hosp., Inc. v. Board of Commissioners,* 108 Idaho 136, 697 P.2d 1150 (1985)). A court may allow expert testimony regarding the factors that affect eyewitness memory and the ability of the witness to testify. 31A AM.JUR. 2d *Expert and Opinion Evidence* § 337 (2008). Most of the jurisdictions which have rejected expert testimony regarding eyewitness memory and identification have

done so on the basis that it invades the province of the jury. *Id.* However, like all testimony, the jury is free to accept or reject and assign weight to the testimony based on the witness' credibility. *Id.* Traditionally, this Court has found that the reliability of eyewitness testimony is not outside the understanding of the average juror, and therefore, would not warrant expert testimony. *State v. Bingham,* 116 Idaho 415, 420, 776 P.2d 424, 429 (1989). In *Bingham* this Court found that although the reliability of eyewitness testimony is not typically outside the understanding of the average juror, there may be a circumstance where the average juror is not equipped to understand the reliability of eyewitness testimony without the use of an expert. *Bingham,* 116 Idaho at 420–21, 776 P.2d at 430 (holding that it is not outside the understanding of the average juror to recognize the ability of a mentally retarded twelve-year-old to correctly perceive and report events).

In *Hopkins,* the court of appeals found that the refusal of the magistrate court to qualify the defendant's expert "deprived [the defendant] of the opportunity to present testimony challenging the scientific hypothesis and physical theories of [the State's evidence]." *Hopkins,* 113 Idaho at 681, 747 P.2d at 90. Additionally, the failure to qualify Hopkins' expert left him unable to present evidence as to the reliability of the particular procedures used by the State to gather evidence (in this instance, the reliability of the specific breathalyzer machine).[12] *Id.* Ultimately, the court found that without the opportunity to testify as to the reliability of how the State gathered evidence, the court was left with a reasonable doubt that the jury would have reached the same result had the error not occurred. *Id.* That is, without the ability to challenge the state's primary evidence against him through expert testimony (the breathalyzer test), the court was left with a reasonable doubt that the jury had

---

12. I do not cite Hopkins because the reliability of eyewitness identification is as far outside the understanding of the average juror as the workings of a breathalyzer machine, but because I find Hopkins helpful on two relevant points. First, the court expressly states that hands-on experience with the specific breathalyzer machine is not necessary to be qualified as an expert on breathalyzers, and second because the court notes that the expert testimony was the defendant's only means to challenge the gravamen of the state's evidence.

enough evidence to continue to support the verdict.

In the present case, Pearce offered Dr. Charles Honts as an expert witness to testify on the inherent dangers of eyewitness testimony, standardized procedures for conducting lineups and resulting effects on identifications if such procedures are not followed. The defense laid the following foundation for Dr. Honts' testimony: (1) Dr. Honts is a full-time professor of psychology at Boise State University; (2) he received a Bachelor of Science in psychology, a Master of Science in experimental psychology, and a Ph.D. in experimental psychology; (3) Dr. Honts' courses consist of Psychology and Law [13], Research Methods, Theory Personality, Introduction to Psychology, Statistics, Industrial Psychology and Physiological Psychology; (4) Dr. Honts supervises student research projects; (5) most of Dr. Honts' research is conducted on credibility assessments (polygraph tests and ways of determining if people are telling the truth). He has also researched jury behavior, human memory, susceptibility of eyewitnesses to post-event suggestion, creation of false memories, basic statistical issues, statement analysis (methods for looking at a person's statement) and child witnesses; (6) he regularly attends meetings for American Psychology–Law Society, where a popular and frequent topic is eyewitness behavior and conduct of lineups; (7) Dr. Honts keeps current on lineups and eyewitness behavior as part of his professorial duties; however, Dr. Honts has never personally questioned a witness or conducted a lineup; (8) he has supervised one dissertation on suggestibility of eyewitnesses and one dissertation on the creation of false memory; (9) Dr. Honts testified that he is familiar with the topics of weapons-focus phenomenon,[14] the forgetting curve,[15] the phenomenon of unconscious transference,[16] the tendency to assimilate post-event information,[17] and the feedback factor;[18] (10) Dr. Honts has read and familiarized himself with two articles at the request of defense counsel, addressing basic principles of lineups and accuracy, addressing controversial areas and widely accepted areas, and lineup procedures and recommended procedures for conducting accurate lineups (based on scientific research); (11) he has read the sections addressing lineups and photo-spreads of the *Eyewitness Evidence Guide, a Guide For Law Enforcement*, which is published by the United States Department of Justice; and (12) finally, Dr. Honts has viewed the photo-spread and video lineup used in this case and is able to discuss quality in relation to suggested procedures, without addressing any individual lineups.

The district court ruled that Dr. Honts' testimony would be partially excluded. The court allowed Dr. Honts to testify regarding the characteristics, changes and storage of memory, but suppressed any testimony regarding lineups and eyewitness identification. During the hearing on the motion, defense counsel for Pearce, in arguing for Dr. Honts as a witness, stated that Dr. Honts would be "an expert [to] testify as to the fallacies [in lineups] and the explanation. Now [Dr. Honts is] not going to get into each individual identification and the background. That, the jury can decide." It is clear from counsel's statements that the defense clearly understood the line between permissible expert testimony which would aid the average juror's understanding, and impermissible expert testimony that would invade the province of the jury's fact-finding ability. Counsel never intended for Dr.

13. This course examines the legal profession and forensics in general, insanity and how insanity and competency to stand trial are assessed, how lineups, interviews, and polygraph tests are conducted, assessment of child witnesses and jury behavior.

14. Where a weapon interferes with a person's ability to observe

15. Period of time between observance and identification

16. Condition where information from one situation will be attributed to another

17. Interactions that may create new information into the memory

18. Where two or more witnesses discuss observations

Honts to testify as to the accuracy of the individual identifications.

The lower court's decision expressly stated that this Court has traditionally ruled that expert testimony on the reliability of eyewitness testimony is not admissible because it invades the province of the jury in determining the credibility of witnesses. Although that statement may be true if an expert is proffered to vouch for or refute the accuracy of a particular identification, I find that it was an abuse of the district court's discretion when it excluded Dr. Honts' testimony as it relates to accepted procedures for eyewitness identification, whether the lineups in this case comport with those procedures, and any scientific data which may affect the result of eyewitness identification when the procedures are not followed.

A lower court does not abuse its discretion if (1) the court recognizes the issue as one of discretion, (2) the court acts within the bounds of that discretion and applies the appropriate legal standards, and (3) the court exercises reason in reaching the decision. *State v. Moore,* 131 Idaho 814, 819, 965 P.2d 174, 179 (1998) (citing *Sun Valley Shopping Ctr., Inc. v. Idaho Power Co.,* 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991)). Here, the district court recognized the decision as one of discretion. However, the court did not apply the appropriate legal standards within the bounds of that discretion. The lower court's decision found that Dr. Honts was not qualified to testify on standardized procedures for lineups and eyewitness identifications because (1) Dr. Honts had never participated in a lineup; (2) Dr. Honts had not spoken with the witnesses who participated in the photo-spreads and lineups; (3) Dr. Honts had not viewed all of the composite sketches; (4) Dr. Honts had only viewed the video lineups three days ago; and (5) Dr. Honts had never testified as an expert on standardized lineup procedures. I believe that the failure to qualify Dr. Honts on the preceding grounds was an abuse of the district court's discretion.

The entire decision of the lower court, although citing the rules of evidence, relied heavily on previous decisions of this Court, most of which found that the particular trial court had not abused its discretion. The bounds of discretion authorize a lower court to reach a decision based on the merits of the individual case presently in front of the court. Specific academic training in a particular field has never been required to qualify an expert. "Idaho has interpreted the five qualification areas as disjunctive, holding that academic training is not always necessary and that *practical experience or special knowledge or training in a related field* ... might suffice." *Hopkins,* 113 Idaho at 681, 747 P.2d at 90(emphasis added) (citing *IHC Hosp., Inc. v. Board of Commissioners,* 108 Idaho 136, 697 P.2d 1150 (1985); IDAHO EVIDENCE COMMITTEE REPORT TO THE IDAHO STATE BAR, C 702 at 2–3 (1984)). Dr. Honts may not have been the best expert to testify on this matter, but the rules do not require an expert to be the best witness in that particular field. The rules of evidence establish a floor of who qualifies as an expert, not a ceiling. They require the expert to have "scientific, technical, or other specialized knowledge" and that the expert is qualified to testify by "knowledge, skill, experience, *training, or education.*" I.R.E. 702 (emphasis added).

Here, it is clear that Dr. Honts has attended numerous seminars relating to eyewitness identification and is well-read on the subject. The majority states that "[t]he record reveals sufficient evidence to support the district court's conclusion that Dr. Honts lacked academic or practical experience specific to the area of lineup procedures." However, the rules of evidence do not limit an expert's "scientific, technical, or other specialized knowledge" to persons with "academic or practical experience." Dr. Honts' training and research in the area, especially in light of his educational background and experience, sufficiently qualify him to testify on lineup procedures and resulting identifications. The district court's emphasis on Dr. Honts failure to interview all eyewitnesses and to view all composite sketches is also analytically flawed. Dr. Honts' lack of case-specific knowledge is largely irrelevant. Expert testimony on general lineup procedures does not require case-specific knowledge. For example, in Hopkins, it was held that direct expe-

rience with a particular breathalyzer machine goes to the weight of the testimony, rather than the admissibility. *Hopkins,* 113 Idaho at 681, 747 P.2d at 90. However, Dr. Honts had gathered the information necessary to determine whether the correct lineup procedures were used during the video lineup. Therefore, requiring Dr. Honts to view the composite sketches prior to testifying on the video lineup seems unnecessary due to their unrelated nature. As stated in Hopkins, any lack of case specific knowledge would go towards the weight the jury assigns the testimony, rather than the admissibility. *Id.*

I find that Dr. Honts is qualified, through his research, training and experience, to testify on (1) standardized and accepted modes of lineups; (2) whether, in Dr. Honts' opinion, the procedures employed in this case conformed with the standardized procedures and accepted modes of lineups, and if not, why not; (3) any studies which show that the accuracy in eyewitness identification is decreased when the accepted lineup procedures are not used; and (4) the aspects of memory and how different environmental stimulus may affect the retention of memory and perception.[19]

The failure of the trial court to qualify Dr. Honts as a witness was a clear abuse of discretion. The district court misconstrued previous decisions of this Court and incorrectly applied the standard of law. Direct and in-depth research of the immediate case is not required to testify on general procedures and whether they were employed in this specific instance. Further, the fact that Dr. Honts has never testified as an expert on this particular matter is of virtually no significance. At most this means that Dr. Honts has not made a career out of providing expert testimony; in other words, he is not a professional witness for hire. Additionally, few cases warrant expert testimony on lineup procedures, and as stated previously, courts typically find that expert testimony on witness perception invades the province of the jury. Unless a case falls into extraordinarily narrow circumstances, such as this case, it

would seem that very few experts may have the opportunity to testify on lineup procedures.

However, I do not disagree with the district court's exclusion of expert testimony regarding whether Pearce was or was not the woman involved in the attack on Ms. LeBrane. Any testimony by an expert which states whether any particular eyewitness identification is in fact correct or incorrect invades the province of the jury. The district court correctly found that any statements regarding the witness' credibility would invade the province of the jury. If Dr. Honts, in his testimony, stated whether a person was, in his opinion, speaking truthfully, then the province of the jury would be invaded. However, testimony that relates to the proper procedures to conduct an accurate lineup, whether or not those procedures were employed in this instance and the potential effects of non-compliance does not invade the province of the jury.

The present issue is whether Pearce was afforded a fair opportunity to present a defense in this case. Without the ability to present expert testimony which may help a jury assign weight towards the state's case against her, she was deprived of the opportunity to present her case fully and fairly. A fair trial requires a fair lineup, and in instances such as the present case where "fair" would be a far stretch from reality, a defendant should be afforded the chance to present to the jury, through expert testimony, how and why eyewitness identifications may be flawed. However, it remains within the province of the jury to assign weight to that evidence and under no circumstance should expert testimony be allowed to express a direct opinion on whether a particular witness is credible. Additionally, expert testimony on eyewitness identification should only be available in the most extreme cases. Regardless if a witness is qualified as an expert, a trial court is free to limit testimony in an instance where the information will not help the jury understand or determine a fact

**19.** Dr. Honts was previously qualified and allowed by the trial court to testify on the aspects of memory. I do not mean to limit Dr. Honts'

testimony from the previous trial, but to state that the trial court correctly found that Dr. Honts was qualified to testify on those matters.

in issue. *See generally Bingham,* 116 Idaho at 421, 776 P.2d at 430.

I further find that any such error was reversible error. In this case the issue of eyewitness identification was crucial because there was very little other evidence connecting Pearce to the crime. In fact, there appears to be direct evidence inconsistent with a finding of guilt.[20] The state bore the burden of proving every fact beyond a reasonable doubt, including that a crime was committed and that the defendant committed that crime. *Avelar,* 124 Idaho at 320, 859 P.2d at 356. The Court of Appeals found that the exclusion of Dr. Honts' testimony was harmless error because "[f]rom a scientific standpoint, the generic concerns in regard to lineups and subsequent identifications were sufficiently covered by other testimony offered by Dr. Honts and other witnesses." Although I fully support the Court of Appeals conclusion that the exclusion of Dr. Honts' testimony was error, I cannot support a finding that the error was harmless. Under the unique circumstances of the present case, in which there is a paucity of incriminating evidence other than the eyewitness identifications, and substantial exculpatory evidence, some of which the jury never heard, it is simply impossible for me to find that it was harmless error to exclude the testimony of Dr. Honts.

Several of the witnesses addressed memory and how people perceive, how people forget, and any external factors that would have an effect on perception. The investigating officers also testified to the lineup and photospread procedures they specifically used, and that there were no instructions or standardized program for conducting procedures which were available to them. However, no witness testified regarding the correct procedures, whether correct procedures were used in this instance and how incorrect procedures may affect the ultimate outcome of the eyewitness identification. An offer of proof was made of Dr. Honts' excluded testimony on temporary remand from the Court of Appeals. Dr. Honts testified that the Department of Justice has released a publication on eyewitness procedures which contains four standards for conducting eyewitness identification through photo-spreads and lineups. Those principles specify that, (1) the lineup should be double-blind;[21] (2) the witness should not have knowledge of whether a person of interest is in the lineup; (3) persons in the lineup should match the description given by the witness; and (4) a statement of confidence should be made and recorded. Dr. Honts then walked through different identifications and confirmed that the four principles were not followed, and further, how the failure to follow the principles may have influenced the witness in his or her choice.

For example, the video lineup was conducted by Sergeant Miles, who knew that Pearce was the person of interest and that she was in custody, so it violated the first principle because it was not double-blind. If the lineup is not double-blind, the interviewer may subconsciously guide a witness to the "correct" choice. That is, through body language or subtle clues, the witness may choose the answer that the interviewer seeks.[22] Additionally, the second principle was violated when Ms. LeBrane was not given a warning

---

**20.** For as much time as I have spent on this case, I have yet to find a reconcilable answer to Steve and Joseph Rupert's identification of Pearce and the use of Ms. LeBrane's credit card in Jordan Valley, Oregon less than 30 minutes later. Further, on a post trial Motion for New Trial, facts were presented to the trial court (but not to the jury) regarding one of the previous suspects who had been identified through a photo-spread by Ms. LeBrane as the female attacker. The other suspect had been identified by a third party as visiting his home with Jeremy Sanchez and the Wurdenmann brothers in the early morning hours on the night of the attack. The third party filed a statement with Pearce's lawyer that Mr. Sanchez and the female suspect used a hose to wash blood off of them and they stated that they

were going to California that night, which would take them through Jordan Valley, Oregon.

**21.** That is, the person conducting the lineup does not know who the suspect is in the lineup or whether any of the persons in the lineup are suspects.

**22.** Recall that the statement switched during the video lineup at Pearce's turn from drugs/money to money/drugs. It is absolutely undeterminable whether this switch was a subconscious subtle clue resulting from the violation of principle one, but it is a prime example of the importance of the principles.

that the person of interest may not be in the video lineup and it is disputed whether she was told to choose the person who looks most like her attacker. When a witness is told to make a relative judgment, the witness no longer recalls the memory of the attacker, but makes a comparative judgment of which person in the lineup most closely matches the attacker, rather than choosing the correct person from their memory. Dr. Honts further stated that the third principle was violated because of the discrepancy in hair length [23] and that there was no reference to height. Because Ms. LeBrane's initial descriptions of the female attacker focused on the hair and height, all the lineups should have been conducted based on that description and included a reference to height. Dr. Honts further testified that by making the reference to height only relative to other persons in the lineup, none of whom had an expressed height, it might lead the witness to believe that all the persons are 5'1 or shorter. Therefore, any reference to comparative height in the lineup is actually flawed, if all the suspects are actually around 5'6.[24] Ms. LeBrane, without a reference to height, could have been led to believe that she was viewing women 5'1 or shorter, and among that group, Pearce stood about 5'1 or shorter, when in reality Pearce is 5'6. And finally, Dr. Honts stated that the fourth principle was violated because no statement was made or recorded of Ms. LeBrane's confidence in her choice. This principle is important because a person has a tendency to become more confident in their choice as time progresses. Therefore, any resulting identifications at trial will be overly confident in comparison to the initial identification. Taking into account the testimony by Dr. Honts during his offer of proof, I can definitively say that I am left with more than a reasonable doubt that the exclusion of Dr. Honts' testimony contributed to the jury's verdict.

The overwhelming majority of the state's evidence consisted of eyewitness testimony as to whether Pearce was the woman involved in the attack. Although the jury had the benefit of Dr. Honts' testimony in regard to memory and perception, there is no bridge to mend the proverbial gap of how a flawed memory will effect a resulting identification. This jump is deceptive because it is seemingly logical. Although it is intuitive that a flawed memory may create a flawed identification, it is not intuitive that a flawed lineup will consistently produce flawed results. As stated by Pearce's counsel in oral arguments, the repetition factor weighs heavily in this case. The jury hears from four people that Pearce is the alleged perpetrator, but most of the memories created were likely flawed.[25] Therefore, the jury hears that a flawed memory is created, but also hears that four people have identified Pearce. What the jury doesn't hear is that a flawed lineup will consistently produce flawed results, regardless if the identifier has any knowledge of the crime. To the jury the repetition factor may reduce the significance of any flawed memories. However, if the flaw is in the underlying process for identification, the flaw is superimposed on any subsequent identification. A flawed lineup will cause a person with no memory or knowledge of the underlying crime to be able to correctly identify the person of interest. It is that information of which the jury was deprived. Without such information, I am left with a substantial doubt that the jury would have reached the same conclusion.

I am unable to say beyond a reasonable doubt that the exclusion of Dr. Honts' testimony did not affect the verdict. In fact, I strongly believe that it did affect the verdict. This error was not harmless. Without such testimony, Pearce was denied the ability to present scientific evidence which rebutted the majority of the state's evidence against her, constituting reversible error.

23. Recall that four of the six women had long hair in ponytails, and Pearce was one of two women with short hair.

24. It is assumed that because in the video lineup Pearce was of average height comparatively, that all the other people were about the same height as Pearce, which is 5'6.

25. During the trial, Dr. Honts was qualified and permitted to testify on the process of memory creation and depletion, and how different factors will contribute to the creation of a false memory.

### III.

For the foregoing reasons, I would reverse Pearce's conviction and remand to the district court for a new trial.