# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 44358

TOREY MICHAEL ADAMCIK,    )
            )
        Petitioner-Appellant,    )
            )
v.            )
            )
STATE OF IDAHO,    )
            )
        Respondent.    )
            )

Boise, November 2017 Term

2017 Opinion No. 136

Filed: December 26, 2017

Karel A. Lehrman, Clerk

---

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, Bannock County. Hon. Mitchell W. Brown, District Judge.

The district court's judgment is <u>affirmed</u>.

Nevin, Benjamin, McKay & Bartlett, LLP, Boise, for appellant. Dennis A. Benjamin argued.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent. John C. McKinney argued.

---

BRODY, Justice

Torey Michael Adamcik appeals seeking relief from his conviction and sentence for the murder of Cassie Stoddart when he was sixteen years old. This Court previously affirmed the conviction and sentence of life without the possibility of parole. Adamcik sought post-conviction relief in the district court on several claims, including ineffective assistance of counsel and that his sentence violated the federal and state bars against cruel and unusual punishment. The district court denied all of Adamcik's claims following an evidentiary hearing. On appeal, Adamcik contends that the district court erred in denying his requested relief as to three of the ineffective assistance of counsel claims. He additionally asserts the district court erred in denying his claim that the imposed sentence of life without the possibility of parole violates the Eighth Amendment to the United States Constitution and Article 1, section 6 of the Idaho Constitution in light of the recent Unites States Supreme Court opinions. For the reasons that follow, we affirm.

1

# I.   FACTUAL AND PROCEDURAL BACKGROUND

This Court provided a detailed factual record of the events surrounding Cassie Stoddart's murder in Adamcik's previous appeal:

On September 22, 2006, Stoddart was spending the night at her cousin's house, the Whispering Cliffs residence, performing house-sitting duties. Matt Beckham (Beckham), Stoddart's boyfriend, stated that he and Stoddart had invited Adamcik to the Whispering Cliffs residence that evening to "hang out." Adamcik and Draper arrived at the Whispering Cliffs residence at approximately 6:30 or 7:00 PM. After spending approximately two hours at the Whispering Cliffs residence, Draper informed Stoddart and Beckham that he needed to leave and shortly thereafter Draper and Adamcik departed.

Approximately fifteen minutes after Adamcik and Draper departed, the power at the Whispering Cliffs residence went out. Beckham called his mother to ask for permission to stay the night, but such permission was denied. After speaking with his mother, Beckham phoned Adamcik to inform him that Beckham would be going home for the night. Beckham later said that during their conversation Adamcik spoke in a whisper and claimed to be at a movie. Beckham and Adamcik spent the following day together. Beckham tried repeatedly to call Stoddart throughout the day but was unable to get an answer.

On September 24, 2006, it was discovered that Stoddart had been killed at the Whispering Cliffs residence. Police officer Hatch responded to the scene and noted large amounts of blood on the victim's body, as well as deep lacerations and stab wounds. Shortly after responding, police and paramedics confirmed that Stoddart was dead. Detectives conducting the preliminary investigation determined that Adamcik and Draper had been among the last people to see Stoddart alive.

Detectives Thomas and Ganske went to the Adamcik home and interviewed Adamcik on September 24, 2006. Adamcik's father, Sean Adamcik (Sean), was present. This interview was the first of two interviews that detectives Thomas and Ganske conducted with Adamcik. During the course of the first interview, Adamcik informed the detectives that he and Draper had gone to the Whispering Cliffs residence at approximately 8:30 PM on September 22, 2006, for a party. Adamcik stated that when it became apparent that a party was not going to take place, he and Draper decided to go and see a movie in Pocatello. When the detectives questioned Adamcik regarding the movie he had reportedly seen, Adamcik was unable to describe what the movie had been about. Adamcik told detectives that following the movie he and Draper had gone to spend the night at Adamcik's home.

On September 27, 2006, after Adamcik's first interview, but before the second, Draper led law enforcement agents to a stash of evidence buried in the Black

Rock Canyon area (BRC site). The evidence uncovered by law enforcement at the BRC site included:

1. Two dagger-style knives with sheaths.

2. A silver-and-black-handled knife with a smooth and non-serrated blade.

3. A folding knife with a silver blade and black handle, which is similar to a survival knife. The portion of the blade nearest to the hilt is serrated.

4. A homemade Sony videotape (BRC tape).

5. A box of stick matches.

6. A melted brown bottle of hydrogen peroxide.

7. Partially burned notebook paper.

8. A partially melted multi-colored mask.

9. A red and white mask.

10. A pair of black boots.

11. A single black glove.

12. A pair of black "Puma" gloves.

13. A pair of blue latex gloves.

14. A pair of fingerless black "Athletic Works" gloves.

15. A black "Calvin Klein" dress shirt.

16. A black "Hagger" shirt.

Adamcik conceded that his handwriting was present on the notebook paper found along with the other evidence at the BRC site. The BRC tape contained footage of Adamcik and Draper planning Stoddart's murder, and later reacting to having killed Stoddart. The BRC tape skips around and is not recorded in chronological order. The following relevant portions of the BRC tape have been rearranged according to the time and date stamps that appear on the BRC tape.

*1. September 21, 2006, at 8:05:23 PM* [Adamcik and Draper are in a car, Adamcik is driving and Draper is filming from the passenger seat]

**Draper:** We're going for a high death count.

**Adamcik:** Plus, we're not going to get caught Brian, if we're going for guns, we're just gonna end it. We're just gonna grab the guns and get outta there and kill everybody and leave.

**Draper:** We're going to make history. . . . We're gonna make history.

**Adamcik:** For all you FBI agents watching this—

**Draper:** (laughing)

**Adamcik:** Uh . . . you weren't quick enough. (laughing)

**Draper:** You weren't quick enough, and you weren't s-s-smart enough. And we're going over to [Jane Doe 1's] house, we-we-we're going to snoop around over there and try to see if she's home alone or not, and if she's home alone, SPLAT! . . . She dead.

**Adamcik:** Don't put your humor into this Brian.

**Draper:** Uh, I'm not putting any humor into it. . . . Yep, people will die, and m-m-memories will fade.

**Adamcik:** Memories will fade. . . . I, hmm, I wonder what movie you got that from Brian?

**Draper:** Myself!

**Adamcik:** (laughing)

**Draper:** That was from myself.

**Adamcik:** No wonder it was so lame.

**Draper:**—kay, we're on our way, and I'm gonna, I'll let you stay tuned, we're almost there.

2. *September 21, 2006, at 8:08:12 PM* [Adamcik and Draper are in a car, Draper is filming Adamcik with the camera light on]

**Draper:** We're at [Jane Doe 1's] house. It's clear out there in the pasture. We've already snooped around her house a couple times, Uh, and sh-sh-she's not at home so we're gonna go to that church over there and we're gonna call a girl and a guy named Cassie and Matt. They're our-our friends but we have to make sacrifices. So um I feel tonight i-i-it is the night and I feel really weird . . . and stuff. I feel like I want to kill somebody. Uh, I know that's not normal but what the hell.

**Adamcik:** I feel we need to break away from normal life.

**Draper:** How bright is this light? [Draper has turned the camera light directly onto Adamcik]

**Adamcik:** Because . . . let's put it this way . . . parents, along with their parents, along with their parents, and so on—

**Draper:** Uh-huh

**Adamcik:**—taught them about God, Jesus, the whole bullshit—

**Draper:** (laughing)

**Adamcik:**—line. I'm sure you guys believe in God as well. I realized when I was in seventh grade . . . along, you don't believe in Santa Claus or—

**Draper:** (laughing)

**Adamcik:**—vampires, or werewolves, they're used to metaphor, not let—they teach their kids back in the 1800s, I learned this in English class, about telling

4

their kids that they can't go outside or a vampire will get you—just to make their kids stay and do what they want to do. God is basically—

**Draper:** That's what God's for right?

**Adamcik:**—the same way—

**Draper:** Yep.

**Adamcik:**—tryin' to get people to do good, or else "so-called" [air quoting] you go to hell.

**Draper:** And we're obviously going to hell if it's real, but who gives a shit?

**Adamcik:** And why would you say it's real?

**Draper:** [talking over Adamcik] Yeah, but it's not real. It's not real, cuz it's so blatantly obvious that it's not real, but (laughing)

**Adamcik:** People believe it because their parents teach them, and so it's so hard for them to let go of it because they've been taught their whole life.

**Draper:** Yeah, I know.

**Adamcik:** But, fuckin—

**Draper:** What?

**Adamcik:**—the point I'm makin' is . . . we are also taught that things like killing people and other things is wrong. The only thing that is wrong about is because it's breaking the law and the law is only wrong (mumbling, searching for words)—

**Draper:** Natural selection, dude. Natural selection, that's all I've gotta say.

**Adamcik:** There should be no law against killing people. I know it's a wrong thing, but . . .

**Draper:** Natural selection—

**Adamcik:**—Hell, hell, you restrict somebody from it, they're just gonna want it more.

**Draper:** Exactly. Goodbye camera.

3. *September 21, 2006, at 8:15:39 PM* [Adamcik and Draper are in a car, Adamcik is driving and Draper is filming from the passenger seat]

**Draper:**—home. My friend's too pussy to go investigate—turn here

**Adamcik:** Too smart—

**Draper:** Why aren't you turning there dude?

**Adamcik:** Cuz it's faster this way

**Draper:** Now we're going to go over to Cassie and Matt's house. If they're home alone, we're gonna . . .

**Adamcik:** It's Cassie's house. Matt is there.

**Draper:** Matt is there. Sorry. We're gonna ga—we're gonna knock on the door. We'll see who is there. We'll, we'll see, we'll see-see if their parents are home or not. If they're home alone we will leave our way and then we will come back in about ten minutes. We'll sneak in through the door because chances are they're probably in Cassie's room. S–s–s–so we will sneak in the front door, we'll make a noise outside.

**Adamcik:** And Matt will come out to investigate.

**Draper:** We'll kill him. And we'll scare the shit out of Cassie . . . okay?

**Adamcik:** Sounds like fun.

**Draper:** Well stay tuned.

4. *September 21, 2006, at 8:36:46 PM* [Adamcik and Draper are in a car, Adamcik is driving and Draper is filming from the passenger seat]

**Draper:** We found our victim and sad as it may be she's our friend but you know what? We all have to make sacrifices. Our first victim is going to be Cassie Stoddart and her friends . . .

**Adamcik:** [directed at passing car] God, turn your brights off asshole!

**Draper:** We'll let you . . . (laughs) we'll find out if she has friends over, if she's going to be alone in a big dark house out in the middle of nowhere (laughs). How perfect can you get? I, I mean like holy shit dude.

**Adamcik:** I'm horny just thinking about it.

**Draper:** Hell yeah. So we're gonna fuckin' kill her and her friends and we're gonna keep moving on. I heard some news about [Jane Doe 2], she's gonna be home alone from six to seven so we might kill her and drive over to Cassie's thing and scare the shit out of them and kill them one by fucking one. Hell yeah.

**Adamcik:** Why one by one? Why can't it be a slaughterhouse?

**Draper:** Two by two and three by three. Cause we've got to keep it classy.

**Adamcik:** Keep it classy.

**Draper:** So yeah. It's going to be extra fun.

**Adamcik:** You're evil (laughs).

**Draper:** Yes, I am. So are you dude. Evil. Evil.

**Adamcik:** No. Evil is an expression of God. That was another test you failed.

**Draper:** Evil is not an expression of God.

**Adamcik:** Yes, it is.

**Draper:** That is bullshit and you know it.

**Adamcik:** Evil of origin is a follower of fucking Satan.

**Draper:** There is no Satan.

**Adamcik:** Is Satan real? Then shut up.

**Draper:** Then how are we supposed to express ourselves?

**Adamcik:** Good and Bad.

**Draper:** We're, we're bad.

**Adamcik:** We are bad.

**Draper:** That sounds so shitty.

**Adamcik:** We're evil. That sounds even shittier.

**Draper:** Hey, we're not, okay. Then we are sick psychopaths who get their pleasure off killing other people.

**Adamcik:** That sounds good baby.

**Draper:** We're gonna go down in history. We're gonna be just like Scream except real life terms.

**Adamcik:** That sounds good baby.

**Draper:** We're gonna be murderers. Like, let's see, Ted Bundy, like the Hillside Strangler.

**Adamcik:** No.

**Draper:** The Zodiac Killer.

**Adamcik:** Those people were more amateurs compared to what we are going to be, we're gonna be more of higher sources of Ed gl . . .

**Draper:** Gein

**Adamcik:** Gein

**Draper:** (laughs) Well let's say we're that sick and that twisted—

**Adamcik:** Oh, you know what Ed Gein's words were?

**Draper:** What?

**Adamcik:** He saw a girl walkin' down the street, right?

**Draper:** Yeah.

**Adamcik:** Two questions came to his head. Hmm, I could take her out and have a nice time with her—

**Draper:**—and then kill her? Skin her alive?

**Adamcik:**—charm the pants off her. Or, I wonder what her head would look like on a stick? (laughs)

**Draper:** (laughs) Holy shit!

**Adamcik:** It's creepy huh?

**Draper:** Kick ass.

**Adamcik & Draper:** (laughing)

**Draper:** Murder is power, murder is freedom, goodbye.

**Adamcik:** Umm—

5. *September 22, 2006, at 12:10:58 PM* [Adamcik and Draper are sitting at a table with the camera facing them]

**Draper:** Alright, cool.

**Adamcik:** [looking down and writing in a notebook] I was planning to kill him.

**Draper:** September 22, 2006, we're skipping our fourth hour class. We're writing our plan right now for tonight. It's gonna be cool.

**Adamcik:** We? Torey and Brian . . . [writing] . . . we're making our death list right now, for when, for actually tonight . . .

**Draper:** (whispering) she's watching us . . .

**Adamcik:** (unintelligible)

**Draper:** She's still watching us . . .

**Adamcik:** (mumbling, unintelligible)

**Draper:** [loudly] Number 2 is what?

[long gap where Adamcik and Draper are both concerned a teacher is going to see them, are whispering various things related to this and trying to make themselves less visible]

**Adamcik:** [writing again] Then . . . (unintelligible)

**Draper:** Yeah, if you're watching this we're probably deceased.

. . .

**Draper:** Hopefully this will go smoothly and we can get our first kill done and then keep going.

**Adamcik:** For you future serial killers watching this tape

**Adamcik & Draper:** (laughing)

**Adamcik:** I don't know what to say.

**Draper:** It–It's—

**Adamcik:**—good luck with that.

**Draper:** Good luck.

**Adamcik:** Hopefully you don't have like 8 or 9 failures like we have.

8

**Draper:** Yeah, we've probably tried maybe 10 times, but they've never been home alone so—

**Adamcik:** Or when they have, their parents show up.

**Draper:** As long as you're patient you know, and we were patient and now we're getting paid off, cuz our victim's home alone, so we got er, our plan all worked out now . . . . I'm sorry. I'm sorry Cassie's family, but she had to be the one. We have to stick with the plan . . . and she's perfect, so she's gonna die (laughs)

. . .

6. *September 22, 2006, at 9:53:20 PM* [It is dark and Draper and Adamcik are sitting in a car.]

**Draper:** We're here in his car. The time is 9:50, September 22nd, 2006. Um . . . unfortunately we have the grueling task of killing our two friends and they are right in—in that house just down the street.

**Adamcik:** We just talked to them. We were there for an hour, but . . .

**Draper:** We checked out the whole house. We know there's lots of doors. There, there's lots of places to hide. Um, I unlocked the back doors. It's all unlocked. Now we just got to wait and um . . . yep, we're, we're really nervous right now but, you know, we're ready.

**Adamcik:** We're listening to the greatest rock band ever.

**Draper:** We've waited for this for a long time.

**Adamcik:** Pink Floyd. Before we commit the ultimate crime of murder.

**Draper:** We've waited for this for a long time.

**Adamcik:** A long time.

**Draper:** We—well stay tuned.

7. *September 22, 2006, at 11:31:56 PM* [Adamcik and Draper are in a car driving.]

**Draper:**—just killed Cassie! We just left her house. This is not a fucking joke.

**Adamcik:** I'm shaking.

**Draper:** I stabbed her in the throat, and I saw her lifeless body. It just disappeared. Dude, I just killed Cassie!

**Adamcik:** Oh my God!

**Draper:** Oh, oh fuck. That felt like it wasn't even real. I mean it went by so fast.

**Adamcik:** Shut the fuck up. We gotta get our act straight.

**Draper:** It's okay. Okay? We—we'll just buy movie tickets now.

**Adamcik:** Okay.

**Draper:** (Unintelligible)

**Adamcik:** No.

**Draper:** Okay. Bye.

On September 27, 2006, after the BRC site evidence was found, detectives Ganske and Thomas conducted a second interview with Adamcik at the Pocatello Police Department in the presence of Adamcik's parents. Detective Ganske read Adamcik his *Miranda* rights at the beginning of the interview and Adamcik signed a waiver-of-rights form. During the course of the interview, Adamcik informed detectives Ganske and Thomas that he and Draper had arrived at the Whispering Cliffs residence at 8:00 or 8:30, got a tour of the home, watched a portion of the film *Kill Bill Vol. 2,* departed from the Whispering Cliffs residence at approximately 10:00 PM, and began attempting to break into cars. Adamcik stated that during the course of their attempted burglaries he made multiple calls to Beckham and during the final call Beckham informed Adamcik that his mother was coming to get him from the Whispering Cliffs residence.

Adamcik stated that he and Draper returned to Adamcik's house at around 11:30 PM and did not leave for the remainder of the night. However, when Ganske informed Adamcik that witnesses had seen him at the convenience store, Common Cents, Adamcik stated that he and Draper had gone to the store so that Draper could buy matches for Draper's cigarettes. Adamcik eventually admitted that he and Draper had gone to Black Rock Canyon. At the close of Adamcik's second interview, the detectives informed Adamcik of the evidence that they had discovered at the BRC site and pressured Adamcik to tell the truth. Adamcik responded by asking "Can I talk to an attorney?" The detectives stopped questioning Adamcik immediately, and exited the room, allowing Adamcik and his father, Sean, to converse in private in a different room. Following this private meeting, Adamcik, Sean and the detectives reconvened in the interview room where detectives proceeded to tell Adamcik that he was going to be arrested and informed Adamcik of the evidence they had gathered. In response to intervening questions from Sean, Adamcik made both verbal and nonverbal replies.

At trial, the jury heard extensive forensic testimony documenting and analyzing Stoddart's wounds. The medical examiner, Dr. Steve Skoumal, performed the autopsy on Stoddart on September 25, 2006. Dr. Skoumal determined that the cause of Stoddart's death was stab wounds to the trunk. In all, Dr. Skoumal documented thirty knife-related wounds on Stoddart's body, twelve of which were potentially fatal. The State also had forensic pathologist Dr. Charles Garrison examine Stoddart's body. Dr. Garrison testified "It's my opinion that there were at least two knives used, one of which was a non-serrated blade, and one of which was a serrated blade." In general, the majority of the potentially fatal wounds that Dr. Skoumal listed were inflicted with the serrated blade,

however, wound number 1, which struck the right ventricle of Stoddart's heart, was inflicted by a non-serrated blade—consistent with Dr. Garrison's testimony— and was potentially fatal.

On June 8, 2007, the jury found Adamcik guilty of both conspiracy to commit first-degree murder and first-degree murder.

*State v. Adamcik*, 152 Idaho 445, 454–59, 272 P.3d 417, 426–31 (2012) ("*Adamcik I*") (alterations in original).

Adamcik was sentenced to thirty years fixed and an indeterminate life sentence for the conspiracy conviction, and a fixed life sentence for the first-degree murder conviction. Adamcik sought a sentence reduction, which the trial court denied after a hearing. He then appealed both his conviction and sentence in *Adamcik I*. This Court affirmed the conviction and sentence, and denied Adamcik's petition for rehearing. *Id.* at 487. He appealed to the United States Supreme Court, but his petition for a writ of certiorari was denied. *Adamcik v. Idaho*, 568 U.S. 839 (2012).

Adamcik then sought post-conviction relief from the district court in September 2013, raising seven separate claims. The claims were as follows:

(1) The State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 88 (1963), denying his right to a fair trial.

(2)–(6) Adamcik was denied effective assistance of counsel because—

(2) Counsel could not submit important expert testimony because they failed to test the murder weapons.

(3) Counsel failed to move for suppression of items obtained by an allegedly deficient search warrant.

(4) Counsel failed to move to exclude a video of Adamcik invoking his right to counsel.

(5) The cumulative effect of the deficient performance in the claims alleged above prejudiced him.

(6) Counsel failed to inform him of a favorable plea offer.

(7) The imposition of a fixed life sentence for his conduct as a juvenile violated the prohibition against cruel and unusual punishment codified in the Eighth Amendment to the United States Constitution and Article 1, section 6 of the Idaho Constitution.

The district court granted summary dismissal in favor of the State on Claims 1, 3, and 4 in its January 14, 2015 memorandum decision and order (although the conclusion section erroneously contradicted the body of the order as to Claims 3 and 4). The district court

11

subsequently granted summary dismissal in favor of the State on Claim 7 in its February 24, 2015 memorandum decision and order. Adamcik sought reconsideration of the district court's summary dismissals of those four claims, which the district court denied. The three remaining claims—Claims 2, 5, and 6—proceeded to a two-day bench trial in which twenty-one witnesses testified. The district court denied those three claims. Finally, Adamcik sought a second reconsideration of the district court's dismissal of Claim 7, contending the United States Supreme Court's opinion in *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016)—which was issued after the district court's previous decisions on Claim 7—confirmed his sentence was cruel and unusual. The district court denied his second motion to reconsider, and subsequently entered an order dismissing Adamcik's petition for post-conviction relief. Adamcik timely appealed.

## II. STANDARD OF REVIEW

A post-conviction relief proceeding is a civil action, and thus the "applicant must prove by a preponderance of evidence the allegations upon which the request for post-conviction relief is based." *State v. Payne*, 146 Idaho 548, 560, 199 P.3d 123, 135 (2008). "Summary dismissal of a petition for post-conviction relief is the procedural equivalent of summary judgment under I.R.C.P. 56 and this Court must determine whether a genuine issue of material fact exists, with inferences liberally construed in favor of the petitioner." *State v. Dunlap*, 155 Idaho 345, 361, 313 P.3d 1, 17 (2013) (quoting *Charboneau v. State*, 140 Idaho 789, 792, 102 P.3d 1108, 1111 (2004)). A court must conduct an evidentiary hearing on issues when a genuine issue of material fact exists. *Id.*

When reviewing an alleged constitutional violation, this Court defers to the trial court's factual findings unless they are clearly erroneous. *State v. Pearce*, 146 Idaho 241, 248, 192 P.3d 1065, 1072 (2008). We exercise free review, however, "over a trial court's determination as to whether constitutional requirements have been satisfied in light of the facts found." *State v. Henage*, 143 Idaho 655, 658, 152 P.3d 16, 19 (2007).

## III. ANALYSIS

Adamcik appealed the district court's dismissal of four of his seven post-conviction claims for relief. Three are ineffective assistance of counsel claims. He asserts that defense counsel was deficient in failing to move to suppress the computer evidence based on an allegedly deficient warrant; that defense counsel's deficiency in failing to procure favorable expert testimony regarding the knives was prejudicial; and that the cumulative effect of these errors

prejudiced him. His final claim on appeal is that the district court erred in its application of United States Supreme Court precedent regarding the Eighth Amendment's bar against cruel and unusual punishment to his fixed life sentence.

## A. The district court did not err in determining that Adamcik failed to demonstrate his counsel provided ineffective assistance.

The Idaho Supreme Court "has adopted the *Strickland* two-prong test to evaluate whether a criminal defendant received effective assistance of counsel." *Dunlap v. State*, 141 Idaho 50, 59, 106 P.3d 376, 385 (2004); *Strickland v. Washington*, 466 U.S. 668 (1984). A defendant must prove both that (1) counsel's performance was deficient and (2) the deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687. An appellant must demonstrate "that the attorney's representation fell below an objective standard of reasonableness" in order to prove deficient performance. *Gilpin-Grubb v. State*, 138 Idaho 76, 81, 57 P.3d 787, 792 (2002). To demonstrate prejudice, the appellant must show a "reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 694). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

### 1. Defense counsel's failure to move to suppress the evidence discovered on a computer seized from Adamcik's home was not deficient.

Adamcik contends that his counsel was deficient for not moving to suppress evidence resulting from the seizure of a computer due to an allegedly deficient warrant. Law enforcement searched the Adamcik residence on September 27, 2006 using a search warrant issued by a magistrate judge that same day. The affidavit of probable cause for the search warrant requested authorization for the following:

> To search for and to seize evidence, including but not limited to, bodily fluids, stains, hair fibers and other trace evidence as well as clothing, knives, scripts, journals, video cameras, video tapes, garbage bags, computer, computer programs, cellular telephones and cellular telephone account information, fingerprints and any indicia whatsoever of this crime.

Additionally, the face of the search warrant contained a preamble which referenced the affidavit and repeated the above litany of evidence sought. The command section of the warrant, however, authorized the search and seizure of only "evidence including but not limited to bodily fluids,

stains, hair fibers and other trace evidence as well as fingerprints and indicia of the crime." Adamcik claims that the omission of "computers" from the command portion of the warrant would have required suppression of the computer and any derivative evidence had his counsel filed a motion to suppress. Further, Adamcik contends this was not a strategic decision by counsel. Finally, the evidence attained in this case—referred to as "kiddie porn" photographs— prejudiced Adamcik by negating his ability to present favorable character evidence for fear of opening the door to introduction of these photographs.

The State counters, noting the district court's determination that the failure to include the affidavit language in the command portion of the search warrant was merely a scrivener's error, and not fatal to the warrant's validity and subsequent seizure of the computer. Additionally, the State claims that even if the court had suppressed the "kiddie porn" evidence, it would have had no effect on the outcome of the case.

In *Wurdemann v. State*, 161 Idaho 713, 390 P.3d 439 (2017), this Court recently outlined a two-part inquiry for determining whether the failure to file a motion to suppress satisfies *Strickland*'s deficiency prong. First, the threshold issue is "whether the motion, if filed, should have been granted." *Id.* at 717, 390 P.3d at 443 (quoting *State v. Dunlap*, 155 Idaho 345, 385, 313 P.3d 1, 41 (2013)). A motion that would not have been granted by the trial court ends the inquiry, as counsel's conduct cannot have fallen below a reasonable standard for failing to object to admissible evidence. *State v. Payne*, 146 Idaho 548, 562, 199 P.3d 123, 137 (2008). Second, if the motion would have been granted, "the petitioner is still required to overcome the presumption that the decision not to file the motion 'was within the wide range of permissible discretion and trial strategy.'" *Wurdemann*, 161 Idaho at 718, 390 P.3d at 444 (quoting *Estrada v. State*, 143 Idaho 558, 561, 149 P.3d 833, 836 (2006)).

The Court will first address whether the warrant in this case would have been suppressed. The issuing judge testified at the evidentiary hearing in the trial for post-conviction relief. He testified on direct examination that he "issued the warrant as it was presented" and that he "recall[ed] no specific discussion concerning computers." Additionally, he provided on cross-examination the following relevant exchanges:

> **Q:** As your recollection goes for the September 27th, 2006 warrant in exhibits B, C and D, did you take—do you recall taking any particular measures to delete or cross out anything between the [probable cause] affidavit and the warrant itself, which would be between C and B?

14

**A:** I did not. The only thing that I did with respect to the affidavit of probable cause was I required that they provide some basis for the issuance of a nighttime search warrant on paragraph 11.

**Q:** So there wasn't any purposeful deletions of the authorizing language in what to search at the residence?

**A:** There was not.

. . .

**Q:** Have you ever in your experience found warrants to have some deficiencies that you wanted to add or anything that you wanted to expressly delete and have done so?

**A:** Yes, I have.

**Q:** Was that the case in this particular warrant on the 27th of September, 2006?

**A:** It was not.

Based on this testimony, the district court came to the conclusion that the magistrate intended to sign the warrant "consistent with the request made by law enforcement as outlined in the Affidavit of Probable Cause." Additionally, the court concluded that the failure "to properly include, transfer, or reproduce all of the items upon which law enforcement was seeking authority to search for and seize"—the computer among those omitted—"was a function of a clerical or scrivener's error," not the magistrate's determination that the affidavit lacked probable cause. The inquiry then is whether the omission of the "computer" from the command section of the warrant—which the magistrate did not intend—violates the United States and Idaho Constitutions.

The Fourth Amendment to the United States Constitution requires that warrants must "particularly describ[e] the place to be searched, and the persons or things to be seized." However, decisions must "reflect the recognition that the Fourth Amendment's commands, like all constitutional requirement, are practical and not abstract." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). The circuit courts are nearly uniform in allowing an affidavit to support the particularity requirement when the warrant suitably references the affidavit, and the affidavit accompanies the warrant. *See, e.g*, *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 699–700 (9th Cir. 2009); *United States v. Walker*, 534 F.3d 168, 172 (2d Cir. 2008); *Rodriguez v. Beninato*, 469 F.3d 1, 5 (1st Cir. 2006); *United States v. Ortega-Jimenez*, 232 F.3d 1325, 1329 (10th Cir. 2000). The Supreme Court has acknowledged "that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of

15

incorporation, and if the supporting document accompanies the warrant." *Groh v. Ramirez*, 540 U.S. 551, 557–58 (2004). In *SDI Future*, the Ninth Circuit held that a statement on the face of the warrant noting "the supporting affidavit(s)" was sufficient as a suitable reference and incorporation. 568 F.3d at 700.

This case presents more straightforward language than that in *SDI Future*. The opening paragraph of the warrant unambiguously referenced the affidavit and sworn testimony of Detective Sellers as the basis for the warrant. The opening paragraph listed the same evidentiary items set forth in the affidavit, including the computer. There was no evidence that the magistrate intended to exclude the computer from the scope of the search. In fact, given the magistrate's testimony, the indication here is the opposite of what Adamcik contends. The magistrate testified that he did not intend to exclude anything. Rather, the computer seemed to have been omitted by clerical error.

This Court determines that the computer and derivative evidence would not have been suppressed. Adamcik is thus unable to satisfy the threshold inquiry under *Wurdemann*, and cannot demonstrate that his counsel was deficient under *Strickland*. This Court affirms the district court's decision as to the warrant, since Adamcik failed to prove counsel was ineffective for failing to file a motion to suppress the computer evidence.

### 2. Defense counsel's deficient performance in failing to test the murder weapons did not prejudice Adamcik.

Adamcik next claims that the district court erred when it determined that he was not prejudiced by defense counsel's deficient performance in failing to get additional expert testimony regarding the knife wounds admitted. Further, he claims he was prejudiced by defense counsel's loss of credibility with the jurors due to exchanges with the trial court and opposing counsel during the trial. The State counters that the proffered expert testimony would have made no difference at trial. Additionally, the State contends that any credibility loss suffered by defense counsel was too attenuated from counsel's deficient conduct, and that the trial court's instructions would have negated any resulting prejudice in any event.

Adamcik's defense team attempted to have forensic investigator Rudolf Reit testify at trial that only one knife was used in the killing, ostensibly reinforcing Dr. Edward Leis's testimony that a critical wound could have been caused by a serrated knife, not the smooth-edged knife Adamcik favored. The defense team failed to get the actual murder weapons for testing,

however. Instead, Reit conducted tests on similar "exemplar" knives. The trial court refused to allow evidence resulting from the testing on the exemplars.

Two exchanges took place relating to this evidentiary issue, both in front of the jury. First, the trial court sustained the State's objection to the exemplar knives and stated the following:

> **The Court:** All right. [Counsel], this is a court of law and articles being similar to one in evidence and tests being done on an article similar to one in evidence is not sufficient.
>
> The items in evidence could have been released for testing to your witness, as some were, but—not going to allow this fellow to testify to—testify on tests run on knives he thinks are similar to one.
>
> Just not going to allow it, so we can shorten this up right now. These will not be admitted, and I'm not going to allow him to give opinions on them. I don't think this is something the jury—it could mislead them, I don't think it's proper. He hasn't been proven to be an expert in this field.
>
> Also, he has not used the items in evidence for his testing. So on two grounds he should not be allowed to give an opinion—confuse and mislead the jury, and I don't think it would be proper.
>
> So, we might as well end this right now unless you got more to offer.
>
> **Defense Counsel:** Okay. Well, Your Honor, I think that the standard actually is substantially similar. We looked at that and I appreciate—
>
> **The Court:** [Counsel], this is a homicide case. If you wanted the witness to exam[ine] evidence, you could have made a motion and it would have been granted.
>
> He could have examined the items that we had, not talked about something that he thinks—I emphasize thinks is similar.
>
> I mean, we're talking—we should be talking apples and apples here, but we're talking about items that were found at Black Rock, and then you want - and then he comes in and says, well, he went out and bought some that looked like. Well, that's not good enough in my opinion. That's not good enough in a homicide case like this.

The next exchange took place between defense counsel and the attorney for the State. Adamcik's counsel stated that their team did "ask about the testing of the knives and were told that that would not be possible because of the unique characteristics or whatever of the knives." The post-conviction court summarized the response from the State's counsel:

> Counsel for the State, Mark L. Heideman aggressively disputed [defense counsel's] contention in this regard. [Defense counsel] asserted that the State had "given them full access to all the evidence." Heideman ultimately stated that "for

[defense counsel] to stand here now and say the prosecutors or the police prohibited them [Adamcik's Defense Team] from using those knives, that's—that's a lie. That is not true."

The district court applied *Strickland* and concluded that counsel was deficient for its "performance relative to the issue of obtaining the knives, testing the knives, and presenting testimony concerning the knives and the theory espoused by Reit, which was supportive of the expert testimony of Dr. Leis . . . ." However, the court concluded that this deficiency did not prejudice Adamcik. The district court cited to this Court's previous decision on direct appeal in *Adamcik I*, where we addressed in detail the sufficiency of the State's evidence that the attack involved two knives. *See State v. Adamcik*, 152 Idaho 445, 460–62, 272 P.3d 417, 432–34 (2012) (stating—after outlining the breadth of evidence as to the knife wounds and related testimony—that a reasonable jury could conclude that two knives were used and that both inflicted potentially fatal wounds). The district court concluded that the jury apparently found the State's expert more credible than the defense's as to whether Adamcik's smooth-edged knife was involved in the murder.

Adamcik claims that Mr. Reit's testimony at trial would have served to bolster Dr. Leis's testimony that only one knife—the one with a serrated edge—was used in the attack. However, Mr. Reit testified at the evidentiary hearing that the wound inflicted by the serrated knife "could in part be similar" to those from the smooth knife. Additionally, the smooth knife "could be totally accounted for by the" serrated knife if it was "not plunged all the way into the skin." Based on this testimony, the district court concluded, "While it is certainly possible that Reit's testimony and testing could have been viewed by jurors as supporting Dr. Leis' testimony; it is more probable, in this court's view, that such testimony would have been viewed as supporting [the State's expert] Dr. Garrison's testimony."

As this Court discussed in *Adamcik I*, the jury had sufficient evidence to conclude that two knives were involved in the attack. Adamcik's brief notes that the defense expert, Dr. Leis, testified at trial that the serrated knife could mimic the smooth knife's wound pattern—and the jury rejected it. Additional testimony much to the same effect that the serrated knife, if not fully inserted, could look like the smooth knife would have been unpersuasive especially considering the wound in question had an impact injury associated with it, indicating the knife was "plunged all the way into the skin." This Court agrees with the district court that Mr. Reit's testimony would not have yielded a "reasonable probability that, absent the errors, the factfinder would

have had a reasonable doubt respecting guilt." *Strickland v. Washington*, 466 U.S. 668, 695 (1984).

Additionally, with respect to the prejudice resulting from the exchanges with both the court and opposing counsel in front of the jury, this Court echoes the district court's reasoning and conclusion:

> While this court agrees that trial counsel never wants to be reprimanded by the trial court in the presence of the jury, this court cannot find that this discussion and chastisement, as it has been characterized by Adamcik's current counsel, amounted to prejudice as that term has been defined and applied in *Strickland* and its progeny. First, this court has confidence that the Adamcik jury possessed the capacity to set aside this dialogue between the prosecutor, the trial court, and [defense counsel] and decide Adamcik's guilt or innocence based upon the admitted evidence and not a dialogue between the trial court and counsel as instructed by the trial court in its jury instructions. Second, in order to establish prejudice under the second *Strickland* prong, the evidence must reach a heightened level that but for this chastisement and dialogue, there is a reasonable probability a different result would have been reached by the jury. The court cannot reach such a conclusion on this record. The fact that this dialogue occurred and that [defense counsel] was called a "liar" by [the prosecutor] and "chastised" by the trial court, does not "undermine" the court's "confidence in the outcome" of this jury trial based upon its review of the testimony admitted both at the underlying trial phase and in the post-conviction relief proceedings.

Thus, counsel's deficient performance in failing to secure the actual murder weapons for testing did not prejudice the case such that the "likelihood of a different result [was] substantial." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

**3. The district court did not err in determining that Adamcik was not prejudiced by the cumulative effect of defense counsel's deficient performance.**

Adamcik also contends that even if no single deficiency was sufficiently prejudicial, the cumulative effect of all the deficient performance prejudiced his trial. "Under the cumulative error doctrine, an accumulation of irregularities, each of which might be harmless in itself, may in the aggregate reveal the absence of a fair trial in contravention of the defendant's right to due process." *State v. Martinez*, 125 Idaho 445, 453, 872 P.2d 708, 716 (1994) (citing *State v. Campbell*, 104 Idaho 705, 719, 662 P.2d 1149, 1163 (Ct. App. 1983)). The State argues that Adamcik's cited errors do not rise to the level of due process violation that would require reversal.

The only additional error Adamcik adds to this claim is his counsel's failure to suppress a video tape that showed his invocation of his right to counsel after being read his *Miranda*

warning. On this same tape, however, Adamcik made statements to his father that the trial court ruled were admissible, which were played at trial. Those statements included affirmative replies and nods when his father asked him whether law enforcement's recitation of the evidence was true. The post-conviction court concluded that any negative inferences the jury could draw from Adamcik's invocation of counsel paled in comparison to the inferences they could draw from his exchange with his father—and especially in comparison to the evidence this Court outlined in this case on direct appeal. *See supra* Part II (a portion of the facts from *Adamcik I*).

This Court agrees that the jury's viewing of Adamcik's invocation of counsel is minute in comparison to his admissions to his father, and to the breadth of other evidence in his case. It adds little prejudice to the cumulative mix, and this Court determines the cumulative prejudice does not provide a "reasonable probability . . . sufficient to undermine confidence in the outcome," as *Strickland* requires. This Court thus finds that Adamcik has failed to prove the post-conviction court erred in denying relief for all of his claims of ineffective assistance of counsel.

## B. The district court did not err in denying Adamcik's Eighth Amendment claim.

Adamcik additionally alleges his sentence of a fixed life term violates both the United States and Idaho Constitutions. First, he claims the trial court did not account for the differences in youth and adults during sentencing as required by *Miller v. Alabama*, 567 U.S. 460 (2012) (made retroactive and binding on the states in *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016)). Second, he claims that his sentence is unconstitutional because he is not one of the "rare juveniles" who deserved a fixed life sentence. The State argues that the sentence comported with both United States and Idaho law.

This Court recently decided *Johnson v. State*, 162 Idaho 213, 395 P.3d 1246 (2017), *cert. denied*, No. 17-236, 2017 WL 3493102 (U.S. Nov. 27, 2017), in which the defendant in that case submitted similar arguments. We addressed relief under *Miller* and *Montgomery*, explaining that trial courts are not required to make specific findings regarding incorrigibility and that the Supreme Court of the United States left it to the States to develop appropriate ways to enforce Eighth Amendment requirements:

> *Miller* held that the Eighth Amendment forbids sentencing schemes that require mandatory life in prison without possibility of parole for juvenile offenders. 567 U.S. at 478–79. The Court then went on to state that while sentencing courts may still impose life in prison without possibility of parole for juvenile offenders in homicide cases, the sentencing court must "take into account

how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.*

> *Montgomery* made the holding in *Miller* retroactive and binding on the states. 136 S.Ct. at 734 ("*Miller* announced a substantive rule of constitutional law. Like other substantive rules, *Miller* is retroactive . . . ."). **Montgomery was careful, however, to note that "*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility**." *Id.* at 735. **Indeed the Court specifically stated: "[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences."** *Id.* (quoting *Ford v. Wainwright*, 477 U.S. 399 (1986)). That being said, *Montgomery* also made it clear that "*Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Id.* at 734.

*Johnson*, 162 Idaho at 225, 395 P.3d at 1258 (alteration in original) (emphasis added). This case does not present a mandatory sentencing scheme. The inquiry, then, under the United States Constitution is whether the sentencing court sufficiently took Adamcik's youth into account when ordering a fixed life sentence. Adamcik claims that the sentencing court merely "mentioned" youth during sentencing, rather than considering its distinct attributes, as *Miller* requires. The record presents a different story, however. It demonstrates the sentencing judge specifically took Adamcik's youth—and its attendant characteristics—into account and determined that Adamcik's crimes were not the result of transient immaturity and that he would likely kill again if released from prison.

The record contains ample evidence regarding Adamcik's youth and its attendant characteristics. Two different psychologists offered evidence of Adamcik's youth and immaturity. The Presentence Investigation Report included a pre-trial psychological report from one of those psychologists, Kenneth P. Lindsey, Ph.D. In his report, Dr. Lindsey noted Adamcik's immaturity, disorganized thought processes, spontaneity, and inability to appreciate the gravity of his situation.

The other psychologist, Dr. Mark Corgiat, Ph.D, testified at Adamcik's sentencing hearing. He testified that adolescent brains are not fully developed—which usually takes males until their mid-twenties—and that the average adolescent "possesses less than adult capabilities in planning, reasoning, and judgment." He opined that Adamcik was immature even for his age, and that he "demonstrated a pattern of neurocognitive difficulties that indicated less than age-appropriate judgment, impulse control, and complex problem solving abilities." He also

presented his history of ADHD and Adamcik's Individual Education Plan from school as tending to demonstrate frontal lobe immaturity.

The sentencing judge considered this evidence, in addition to other mitigating evidence, in reaching his decision. The sentencing judge directed the following at Adamcik early in his colloquy:

> Mr. Adamcik, I believe pretty much on this, you're an entirely different individual than portrayed by your family and friends. You do have ADHD, the frontal lobe of your brain not being fully developed due to your age. . . . They say you have knowledge within normal limits, but your processing is below normal.

The sentencing judge discussed Adamcik's youth throughout the colloquy, interspersed with the facts surrounding the crime. The sentencing judge noted Adamcik's cool-headedness in the wake of the killing while Draper, his co-defendant, exclaimed his excitement, and that the pair "methodically and intelligently planned to murder." The judge concluded that despite Adamcik's youth, this crime was the type of rare "barbarous, cold-blooded horrific act" that justified the punishment. The sentencing judge stated, "[B]ased on all the evidence and all that I've read, I'm convinced beyond a reasonable doubt that if you two, or either one of you, were released that you will kill again." Later, during a Rule 35 hearing to consider a reduction of sentence, the sentencing judge, referring only to Adamcik, stated: "I took everything into consideration at sentencing. And I'm not unmindful of how young Torey is—and he was at the time he killed Cassie. I'm not unmindful of Dr. Corgiat's testimony and all the other testimony we have had at the sentencing." It is evident that the sentencing judge here took everything into account when making the decision to impose a life sentence, including ample psychological testimony that Adamcik's youth was a substantial factor in his crimes. This complies with *Miller*'s mandate.

This case parallels this Court's recent *Johnson* opinion in almost every material way. This Court discussed the constitutionality of Johnson's sentencing as follows:

> Here, the trial court held just such a hearing. Drs. Craig Beaver and Richard Worst testified at the sentencing hearing about the developmental state of an adolescent's brain compared to an adult and how youth are more prone to impulsivity and more likely to be able to be rehabilitated. Indeed, Johnson herself spends approximately two pages in her Amended Successive Petition highlighting the evidence presented about her youth. Following the testimony about Johnson's youth and the possible effects that it would have on her decision-making ability and her propensity for rehabilitation, the trial court spent considerable time discussing the reasons why it was imposing life without parole and explicitly

noted that it had heard and considered the evidence presented on Johnson's youth. The trial court's sentencing colloquy was approximately forty-four pages and makes specific reference to having considered the testimony about Johnson's youth, including: "I also want to say to everyone here that I have heard what you have said. I have listened attentively"; "I would also say to you that it's important to me, in this analysis, to consider the totality of all the facts and circumstances, and not any one piece in isolation"; "I recognize that some of the psychological evidence presented here at this sentencing hearing was to the effect that adolescents can act impulsively . . ."; "on the mitigating side, there is in fact your age"; "[ ] I don't think it's a product of your age." Although *Miller* and *Montgomery* had not been decided at the time of the sentencing hearing, and therefore the terms of "irreparably corrupt" and "transient immaturity" where [sic] not in the court's lexicon at that time, the court clearly considered Johnson's youth and all its attendant characteristics and determined, in light of the heinous nature of the crime, that Johnson, despite her youth, deserved life without parole. Accordingly, we affirm the district court's ruling that Johnson's Eighth Amendment claims under *Miller* fail.

*Johnson*, 162 Idaho at 225–26, 395 P.3d at 1258–59.

Here too, no talismanic language is required to satisfy the requirement that the sentencing court consider the "transient immaturity" of youth, or whether Adamcik was "irreparably corrupt." The sentencing judge's conviction that Adamcik would kill again if released is the quintessence of finding him irreparably corrupt, and that his actions were not the product of youth's transient immaturity. The district court in post-conviction proceedings determined that the sentencing judge—without using the term "irreparably corrupt"—concluded Adamcik was exactly that.

The sentencing judge appropriately considered Adamcik's youth and its attendant circumstances, as required by *Miller*, *Montgomery*, and *Johnson*, and his imposition of a fixed life sentence did not violate the prohibition on cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution and Article 1, section 6 of the Idaho Constitution.

## IV. CONCLUSION

For the foregoing reasons, the Court affirms the district court's judgment dismissing Adamcik's petition for post-conviction relief.

Chief Justice BURDICK, and Justices JONES, HORTON and BEVAN CONCUR.